**Melvin D. REUBER, Appellant**

v.

**UNITED STATES of America, et al.**

**Melvin D. REUBER**

v.

**UNITED STATES of America, et al., Appellants Litton Industries, Inc., et al.**

**Nos. 84–5826, 84–5880.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 11, 1986.
Decided Sept. 18, 1987.

Raymond D. Battocchi, with whom Walter H. Fleischer and Alfred F. Belcuore, Washington, D.C., were on brief, for appellant in No. 84–5826 and cross-appellee in No. 84–5880.

Rebecca L. Ross, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on brief, for appellees in No. 84–5826 and cross-appellants in No. 84–5880.

Leonard C. Greenbaum and David M. Dorsen, Washington, D.C., were on brief, for Stauffer Chemical Co., amicus curiae, urging reversal in Nos. 84–5826 and 84–5880.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

Appellant, Dr. Melvin D. Reuber, brought this suit under the Privacy Act[1] against the Department of Health and Human Services (HHS) and the Environmental Protection Agency (EPA), alleging that

---

1. 5 U.S.C. § 552a (1982 & Supp. III 1985).

they had wrongfully maintained in their records, and had also disseminated, copies of a highly critical letter of reprimand sent to Reuber by his employer. The District court granted HHS's motion for summary judgment on two of Reuber's Privacy Act claims, but held summary dismissal of his other privacy claims improper; after a twelve-day bench trial, the District Court ruled in favor of the agencies on virtually all remaining issues, but found that the charges in the letter were partly false and ordered the agencies to destroy any copies remaining in their possession.[2] On these appeals, we order dismissal of the claims Reuber predicates upon alleged inaccuracies in the letter, and affirm, though occasionally on different grounds, the District Court's remaining dispositions in all major respects.

## I. BACKGROUND

In light of the District Court's thorough narrative and detailed findings of the facts,[3] we need recount the history of this gnarled litigation only briefly. Reuber, a pathologist with extensive experience in the field of cancer research, was employed from late 1976 through April, 1981, at the Frederick Cancer Research Center (Frederick), a federal laboratory in Maryland.[4] Litton Bionetics, Inc., under a contract with the National Cancer Institute (NCI), a division of HHS, operated the laboratory and tested various chemicals to assess their potential carcinogenic effects.[5] After approved by NCI, the results of these "bioassays" were published in official NCI reports,[6] and slides of animal tissues used in the Frederick bioassays and other laborato-

ries' projects were deposited at Tracor Jitco, another Maryland facility, where they could be reviewed by scientists doing personal research.[7]

Reuber, who headed Frederick's experimental pathology division, obtained permission from Frederick's director, Dr. Michael G. Hanna, to perform outside research at Tracor Jitco one day each week. Reuber prepared a number of articles based on his independent work, but never sought Frederick's approval before publishing them. He used his institutional address on most of his articles, whether the research was done at Frederick or at Tracor Jitco.[8]

In the late 1970's, Reuber became interested in the pesticide malathion, which had been deemed noncarinogenic in a bioassay conducted by another NCI contract laboratory. He reviewed malathion slides at Tracor Jitco and, in early 1980, completed the draft of a paper disputing NCI's findings and concluding that malathion was indeed a carcinogen.[9] Malathion was by that time the center of a swirling debate; California health officials had made tentative plans to use the pesticide to combat the invading swarms of Mediterranean fruit flies hungrily eyeing the state's agriculture.[10] When a California environmental group requested from Reuber information concerning malathion, he forwarded a copy of his unpublished paper. He dispatched at least two more copies to interested parties in that state, and by late 1980 his malathion paper was in wide if informal circulation. One environmental group disseminated the paper to the news media, heralding it as a statement of NCI's new official position on the carcinogenicity of

2. *Reuber v. United States*, Civ. No. 81–1857 (D.D.C. Sept. 6, 1984) (memorandum), Joint Appendix (J.App.) 60.

3. See *id.*, J.App. 60. For additional background and procedural history of this hydra-headed case, see *Reuber v. United States*, 252 U.S.App. D.C. 43, 787 F.2d 599 (1986) (affirming dismissal of claims against Litton Industries for lack of personal jurisdiction); *Reuber v. United States*, 242 U.S.App.D.C. 370, 750 F.2d 1039 (1984) (affirming dismissal of claims against individual defendants but remanding claims against corporate defendants).

4. *Reuber v. United States*, *supra* note 2, at 2, J.App. 61.

5. Thus Reuber was actually an employee of Litton. See *id.* at 2, J.App. 61.

6. *Id.* at 2–3, J.App. 61–62.

7. *Id.* at 3, J.App. 62.

8. *Id.* at 4–5, J.App. 63–64.

9. *Id.* at 3, 5, J.App. 62, 64.

10. *Id.* at 3–4, J.App. 62–63.

malathion.[11] Reuber reiterated his views in telephone conversations with press representatives and, after California reaffirmed its plans to spray malathion, he wrote to the California Department of Food and Agriculture, criticizing the NCI malathion bioassay and stressing the superiority of his own scientific credentials.[12]

After several inquiries and complaints by California officials and others about Reuber's activities, two NCI executives, Drs. Vernon Hartwell and Richard Adamson, began discussing Reuber's conduct with Litton. In a meeting with Hanna, Adamson charged Reuber with misrepresenting his views as those of NCI.[13] Hanna commenced an investigation and consulted with a number of NCI and Litton employees, including Reuber and Hartwell. Reuber agreed to mail errata letters to journals that had published his independent-research papers bearing the potentially misleading Frederick address. Hanna believed, however, as did Litton President James Nance, that some sanction was also required. Hanna decided that the most appropriate response was a stern letter of reprimand.[14]

On March 26, 1981, Dr. Hanna delivered the censorious letter which eventually spawned this litigation.[15] Hanna accused Reuber of "mishandling of scientific data,"

"carelessness and lack of professional expertise," and "flagrant professional abuse."[16] With more specificity, Hanna charged Reuber with improperly assuming the mantle of NCI endorsement for his private research projects; with overstating the thoroughness of his review of the malathion slides at Tracor Jitco; with spending excessive time away from his duties at Frederick; and with ignoring NCI publication clearance procedures.[17]

Hanna sent copies of this letter to two other Litton officials and to Drs. Adamson, DeVita, Hartwell and Payne of NCI; a distribution list at the bottom of the original identified these recipients.[18] On April 13, 1981, Dr. William Hollis of the National Agricultural Chemicals Association (NACA), a private industry group, received from an anonymous source a plain brown envelope containing a copy of the letter together with copies of the errata letters Reuber had mailed to scientific journals.[19] Hollis gave a copy to Jack Wise of Stauffer Chemical Company,[20] a chemical manufacturer that dealt frequently with EPA.[21] Copies also appeared mysteriously on a public bulletin board at EPA.[22] After the letter was extensively quoted in the April 15th issue of Pesticide and Toxic Chemical

11. *Id.* at 6, J.App. 65.

12. *Id.* at 5–8, J.App. 64–67.

13. *Id.* at 8–9, J.App. 67–68.

14. *Id.* at 10–11, J.App. 69–70.

15. Letter from Michael G. Hanna to Melvin D. Reuber (March 26, 1981), J.App. 941–943.

16. *Id.* at 1, 2, J.App. 941, 942.

17. *Id.* at 1–3, J.App. 941–943; see *Reuber v. United States, supra* note 2, at 12–13, J.App. 71–72.

18. *Reuber v. United States, supra* note 2, at 22, J.App. 81.

19. *Id.,* J.App. 81.

20. Reuber subsequently brought suit in federal District Court against Stauffer for its role in the letter's dissemination. *Reuber v. Stauffer Chem. Co.,* Civ. No. 84–0933 (D.D.C.) (filed Mar. 23,

1984). Because the claims against Stauffer turn on many of the same factual issues resolved adversely to Reuber by the court below, Stauffer filed in these appeals an amicus brief, limited to the issue of Reuber's request for vacatur of the District Court's findings of fact. See Brief for Amicus Curiae Stauffer Chemical Company at 1–2; Part III *infra.* Subsequently, Reuber's claims against Stauffer were ordered dismissed on statute-of-limitations grounds. *Reuber v. Stauffer Chem. Co.,* No. 86–5297 (D.C.Cir. Feb. 10, 1987) (memorandum and order). Since, however, other pieces of this fractured litigation may still remain pending, we later address the issue of vacatur. See Part III–B *infra.*

21. *Reuber v. United States, supra* note 2, at 22–23, J.App. 81–82.

22. *Id.* at 23, J.App. 82. The District Court, apparently crediting Hollis' testimony that the reprimand letter had been posted at EPA, made this finding despite the arguments of both Reuber and the agencies to the contrary. See Brief for Appellant at 62 & n. 30.

News, a trade publication, Reuber resigned from his position at Frederick.[23]

Eventually, Reuber asserted a host of claims against a wide variety of individuals, corporations, and federal agencies. The District Court dismissed all claims against the individual and corporate defendants, as well as claims against the agencies under the Federal Tort Claims Act; this dismissal generated separate appeals to this court.[24] The present Privacy Act claims are premised on contentions that NCI and EPA improperly maintained the damaging reprimand letter in their records and that an NCI official wrongfully disseminated it to the public. The District Court denied a motion by HHS for partial summary judgment on certain of Reuber's claims,[25] but granted a similar motion with respect to others.[26] Following trial of Reuber's residual Privacy Act complaints,[27] these appeals were taken.

## II. REUBER'S APPEAL

### A. Maintenance of Unnecessary Record

Reuber's most basic contention is that HHS violated Section 552a(e)(1) of the Privacy Act by keeping copies of the reprimand letter in its NCI records.[28] This section provides that each agency subject to the Act "shall maintain in its records only such information about an individual as is relevant and necessary to accomplish" a legitimate agency purpose.[29] Reuber believes that NCI had no justifiable interest in such a personal letter of reprimand, since "[t]he hiring, discipline and supervi-

sion of Litton employees was the responsibility of Litton, not the NCI."[30] Reuber further asserts that Litton's contract with NCI proscribed disclosure of the letter, and thus precluded any rightful interest of NCI.[31]

■ The District Court granted summary judgment for HHS on this claim,[32] and we deem its decision perfectly sound. Litton was an important government contractor, and the controversy generated by Reuber, a Litton employee, enmeshed NCI in a scientific debate over the carcinogenicity of malathion and the reliability of NCI bioassays. Given NCI's unquestionable need to ensure public confidence in its work and to avoid public association with Reuber's private dissenting views, some assurance from Litton that the problem had been addressed and would not recur was certainly required. The reprimand letter was an excellent means of demonstrating to NCI Litton's awareness of the delicate circumstances and its commitment to better in-house discipline. We cannot say that retention of this information on file at NCI was irrelevant or unnecessary to a valid agency purpose.

■ Moreover, the contract between Litton and NCI did not prohibit communication to NCI of personnel decisions directly affecting it. Insofar as this contract bears on the controversy, it contained only a standard prescribed clause providing that "confidential information ... of a personal na-

23. *Reuber v. United States, supra* note 2, at 23, J.App. 82.

24. *Reuber v. United States,* Civ. No. 81–1857 (D.D.C. Oct. 27, 1982), J.App. 37; see note 3 *supra.*

25. See *Reuber v. United States,* Civ. No. 81–1857 (D.D.C. Aug. 15, 1983) (memorandum and order), J.App. 51 (denying motion to dispose of claims under 5 U.S.C. §§ 552a(d)(2)–(3) (1982)). District Judge Flannery handled this litigation until March 12, 1984, when the case was reassigned to District Judge Bryant. See Civil Docket Sheet, *Reuber v. United States,* Civ. No. 81–1857, at 25, J.App. 29.

26. See *Reuber v. United States,* Civ. No. 81–1857 (D.D.C. Apr. 13, 1984) (dismissing claims under 5 U.S.C. §§ 552a(e)(1)–(2) (1982)).

27. See text *supra* at note 2. Reuber's remaining claims asserted violations of 5 U.S.C. §§ 552a(e)(5), (6), (7) (1982) and 45 C.F.R. § 5b.9 (1986).

28. 5 U.S.C. § 552a(e)(1) (1982).

29. *Id.*

30. Brief for Appellant at 42.

31. *Id.* at 39–42.

32. See *Reuber v. United States, supra* note 26; see also *Reuber v. United States, supra* note 2, at 29 n. 69, J.App. 88 n. 69. Reuber does not appeal from the summary judgment on the § 552a(e)(2) claim.

ture about an individual" could not be disclosed without the individual's consent.[33] Although the relevant HHS regulations indicate that this prohibition includes "data ... generated by the contractor,"[34] the intent of these regulations is to foreclose premature public dissemination by contractors of sensitive studies or research.[35] There is nothing in the administrative record to indicate that this clause was designed to prevent release to the contracting governmental agency of information important to it.[36] Indeed, the regulations specifically call for prior governmental approval when distribution of certain information is contemplated by the contractor.[37] The contract provision upon which Reuber relies in this connection simply does not cover Litton's disclosure to HHS of personnel decisions directly affecting the agency.

### B. *Intra-Agency Disclosure*

■ Closely related to Reuber's position on Section 552a(e)(1) is his assertion that HHS violated one of its own regulations, which imposes a general prohibition on internal distribution of documents. The regulation in question[38] authorizes intra-agency disclosure of an individual's records only when he consents in writing[39] or when the disclosure is made "[t]o those officers and employees of [HHS] who have a need for the record in the performance of their duties."[40] Because NCI officials on the original distribution list of the reprimand letter made copies thereof for other concerned NCI employees,[41] Reuber insists that he is entitled to damages under the regulations.[42]

■ Reuber's argument depends upon establishment of one of two propositions. He could have attempted to show that the NCI officials on the original distribution list had no need for the letter, in which event further dissemination to other NCI employees would have constituted a violation.[43] We have already approved, however, the District Court's conclusion that these NCI officials did have a work-related

---

**33.** Brief for Appellant at 40–41; Brief for Appellees at 64 & n. 51. This language comes directly from 41 C.F.R. § 3–7.5027(e) (1984) (HHS procurement regulations). On September 19, 1983, the new Federal Acquisition Regulations were added to Title 48 of the Code of Federal Regulations, see 48 Fed.Reg. 42103 (1983), replacing, as of April 1, 1984, the Federal Procurement Regulations System for civilian contracts, previously codified at 41 C.F.R. subtit. A, chs. 1–49, which, however, continue to apply to those contracts which preceded the latter date. See editorial note, 41 C.F.R. subtit. A (1986).

**34.** 41 C.F.R. § 3–1.357(a) (1984).

**35.** See 45 Fed.Reg. 32,306 (1980); 41 C.F.R. § 3–1.357(c) (1984).

**36.** See 41 C.F.R. § 3–1.357(a) (1984).

**37.** 41 C.F.R. § 3–7.5027(f) (1984).

**38.** 45 C.F.R. § 5b.9 (1986).

**39.** *Id.* § 5b.9(a)(1).

**40.** *Id.* § 5b.9(b)(1). Reuber also cites *id.* § 5b App. A(c), which provides that "[e]mployees whose duties do not involve working with systems of records will not generally disclose to anyone, without specific authorization from their supervisors, records pertaining to employees or other individuals which by reason of their official duties are available to them." Even if this section is read to impose a duty

distinct from that of § 5b.9(b)—a dubious proposition—the requirement of authorization is met in this instance. Copies of the letter of reprimand were originally sent by Dr. Hanna to four NCI officials: Drs. Devita, Adamson, Hartwell and Payne. See *Reuber v. United States, supra* note 2, at 22, J.App. 81. The District Court found that six NCI employees "had access" to DeVita's copy of the letter. *Id.,* J.App. 81. If DeVita did disclose the letter to these employees, that was his prerogative as director of NCI. Similarly, Payne, the NCI project officer for Frederick, see *id.* at 10, J.App. 69, distributed five copies. *Id.* at 22, J.App. 81. Hartwell gave one copy to Dr. Ward, a staff pathologist, and another to his own supervisor, Dr. Douglas. *Id.,* J.App. 81. The one possible impropriety would be Hartwell's disclosure to Ward; indeed, the District Court found that this might have violated § (b)(1) of the Act. *Id.* at 30, J.App. 89. The court also found, however, that Reuber had not made the requisite showing of adverse effect, *id.,* J.App. 89; *see Albright v. United States (Albright II)*, 235 U.S.App.D.C. 295, 300, 732 F.2d 181, 186 (1984); 5 U.S.C. § 552a(g)(1)(D) (1982), and we see no reason to disturb that finding.

**41.** See *Reuber v. United States, supra* note 2, at 22, J.App. 81; note 40 *supra.*

**42.** Brief for Appellant at 42–45.

**43.** See 45 C.F.R. § 5b.9 (1986); text *supra* at note 31.

need for the letter,[44] and subsequent distribution would not be deemed unlawful on that account.

Alternatively, Reuber might have demonstrated that although the initial distribution was proper, the NCI employees who additionally received the letter did not themselves have any legitimate need for it. We have searched in vain for support on this point by Reuber. He makes the general assertion that the "letter was not relevant or necessary to any NCI function, and NCI employees had no need for it," [45] but we can find no indication of any individual NCI staff member to whom release was improper. Reuber's claim must fail on this account as well.[46]

## C. Agency Determination

■ Reuber next contends that the censorious letter "constituted . . . a determination by NCI to reprimand him," [47] and that this determination in turn was based upon a number of NCI record documents that were "inaccurate and irrelevant." [48] According to Reuber, NCI thereby transgressed Section 552a(e)(5) of the Privacy Act, which provides that each agency shall "maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination." [49]

The District Court stated unequivocally that "[t]he . . . letter [of reprimand] itself did not represent an NCI determination." [50] The decision to reprimand Reuber was made by Hanna, a Litton official, who also gauged its severity.[51] The District Court thus found no agency action, without which no claim lies under Subsection (e)(5).

Reuber nonetheless divines some ambiguity in the court's finding and invites us to adopt his reading of the court's opinion, which is that Hanna simply effectuated an NCI determination. This argument is strained at best; the District Court left no doubt that it fully intended to rule against Reuber on this score. The court's finding is far from clearly erroneous, and we accordingly affirm it.

## D. Extra-agency Dissemination

■ Reuber also asserts a claim of disclosure of the reprimand letter to persons outside HHS. Section 552a(e)(6) prohibits such a dissemination unless reasonable efforts are made to ensure the accuracy of the records.[52] Reuber insists that possession of the letter by outside parties and its appearance on a public EPA bulletin board lead ineluctably to the conclusion that NCI breached its duties under the Privacy Act.[53] We disagree.

In the District Court proceedings, Reuber relied on circumstantial evidence in an effort to show that Dr. Hartwell of NCI was the likely source of the leak; he theo-

44. See text *supra* at notes 28–37.

45. Brief for Appellant at 43.

46. We affirm as well the District Court's conclusion that § 552a(b)(1), which bans disclosure except to agency officers and employees "who have a need for the record in the performance of their duties," 5 U.S.C. § 552a(b)(1) (1982), was not violated. See *Reuber v. United States, supra* note 2, at 30, J.App. 89.

47. Brief for Appellant at 45.

48. *Id.* Among these documents is a January 30, 1981, letter from Keith Maddy, a staff toxicologist at the California Department of Food and Agriculture, to Dr. Richard Tjalma of NCI, discussing and criticizing Reuber's activities concerning the carcinogenicity of malathion. See J.App. 890. Since we accept the District Court's finding that no "determination" regarding Reu-

ber was made by NCI, see text *infra* following note 51, we need not address the degree to which the letter of reprimand mirrors the January 30 communication.

49. 5 U.S.C. § 552a(e)(5) (1982).

50. *Reuber v. United States, supra* note 2, at 28, J.App. 87.

51. *Id.,* J.App. 87.

52. 5 U.S.C. § 552a(e)(6) (1982) decrees that each agency maintaining a system of records shall, "prior to disseminating any record about an individual to any person other than an agency, . . . make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes."

53. See Brief for Appellant at 51–57, 62–63.

rized that Hartwell must have been the anonymous sender of the packet mysteriously received by Dr. Hollis of NACA. After carefully examining the evidence and assessing the credibility of the witnesses, however, the District Court held that Reuber had not carried his burden of showing that NCI, rather than Litton or someone else, was responsible for disseminating the letter.[54]

■ Reuber's argument on appeal is simply a restatement of his view of the evidence.[55] Our standard of review, however, demands detection of a clear error on the part of the District Court, and does not permit us to reexamine and overturn factual findings simply on the basis of a litigant's alternative version of the truth.[56] Perhaps anticipating our unwillingness to engage in untrammeled de novo review, Reuber invites us to shift the burden of proof on this issue to the agency.[57] We are aware of no authority for such a maneuver,[58] and we therefore must affirm the findings of the District Court.[59]

Reuber also contends that he should have been awarded damages for EPA's maintenance of the letter on a public bulletin board.[60] This argument is fraught with deficiencies, perhaps the most serious of which is Reuber's failure to demonstrate any adverse effect therefrom. Given that Reuber argued in the District Court that the letter did *not* appear on the bulletin board,[61] this shortcoming is not surprising, but it is nonetheless fatal.[62]

### E. Maintenance of Records Depicting First Amendment Activity

The most troubling claim advanced by Reuber is that HHS, by retaining the repri-

**54.** See *Reuber v. United States, supra* note 2, at 24–27, J.App. 83–86.

**55.** See Brief for Appellant at 51–57.

**56.** See Fed.R.Civ.P. 52(a); *Pullman-Standard v. Swint,* 456 U.S. 273, 287–288, 102 S.Ct. 1781, 1789–1790, 72 L.Ed.2d 66, 78–79 (1982); *Cuddy v. Carmen,* 246 U.S.App.D.C. 25, 29–30, 762 F.2d 119, 123–124, *cert. denied,* 474 U.S. 1034, 106 S.Ct. 597, 88 L.Ed.2d 576 (1985); *Case v. Morrisette,* 155 U.S.App.D.C. 31, 37–39, 475 F.2d 1300, 1306–1307 (1973).

**57.** See Brief for Appellant at 51–57.

**58.** Reuber offers no legal precedent for shifting the burden of proof in a Privacy Act case. See *id.* at 59; see also *Mervin v. FTC,* 192 U.S.App.D.C. 212, 218, 591 F.2d 821, 827 (1978) (except when plaintiff seeks *disclosure* of records, "the ordinary rule imposing the burden of proof on the plaintiff should apply").

**59.** Moreover, we previously rejected a variant of this argument at an earlier stage of this litigation. See *Reuber v. United States, supra* note 3, 242 U.S.App.D.C. at 381–382, 750 F.2d at 1050–1051.
  In No. 86–5047, Reuber appeals from the District Court's denial of his motion for relief under Fed.R.Civ.P. 60(b)(2). *Reuber v. United States,* Civ. No. 81–1857 (D.D.C. Dec. 20, 1985) (order). We granted Reuber's request to consolidate that appeal with Nos. 84–5829 and 84–5880, *Reuber v. United States,* No. 86–5047 (D.C. Cir. Apr. 17, 1986) (order), and now affirm the District Court's denial of Reuber's motion for relief under Rule 60(b)(2). Reuber claims that new evidence, obtained through the posttrial deposition of Luther Shaw, a NACA employee, demonstrates conclusively that NCI was responsible for improperly disseminating the letter of reprimand. Reuber also contends that Shaw's recollections establish fraud on the part of NCI and those NCI employees, such as Hartwell, who denied leaking the letter. The agencies urge affirmance on the grounds that Reuber's "new evidence" could have been discovered much earlier had he sought it diligently, that the allegations of fraud were unsubstantiated, and that the motion was untimely.
  A denial of relief under Rule 60(b) may be overturned only upon a showing that the District Court abused its discretion. *Browder v. Director, Illinois Dep't of Corrections,* 434 U.S. 257, 263 n. 7, 98 S.Ct. 556, 560 n. 7, 54 L.Ed.2d 521, 530 n. 7 (1978); *MacLeod v. D.C. Transit Sys., Inc.,* 108 U.S.App.D.C. 399, 400, 283 F.2d 194, 195 (1960). We have examined Shaw's deposition, and find no such abuse in the ruling on Reuber's motion. On the contrary, we are satisfied that the District Court properly rejected Reuber's characterization of Shaw's testimony. Shaw recalled only that he was handed a copy of the letter by NACA's Dr. Hollis in the presence of a man whom Shaw believed was an NCI employee. Nothing in Shaw's testimony linked this unidentified party to the letter itself. We therefore affirm the order of the District Court.

**60.** See Brief for Appellant at 62–63; Reply Brief for Appellant at 36–37.

**61.** See Brief for Appellant at 62 & n. 30; note 22 *supra.*

**62.** See 5 U.S.C. § 552a(g)(1)(D) (1982); *Albright II, supra* note 40, 235 U.S.App.D.C. at 300, 732 F.2d at 186.

mand letter in its NCI files, contravened Section 552a(e)(7).[63] This section specifies that affected agencies shall "maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity."[64] Reuber maintains that the letter of reprimand, because it in part discussed publication of his malathion research, constitutes just such a proscribed record.

The District Court dismissed this contention holding that Reuber "had no first amendment right to dispute NCI bioassays without either getting NCI clearance or insuring that his views would not be taken for those of NCI. Plainly he had a right to speak out on malathion, but not in the manner described in the ... letter."[65] The court thus found the letter to be "outside the scope" of Subsection (e)(7).[66]

█ We think the District Court focused prematurely on whether Reuber's communications commanded constitutional protection. The relevant question is not whether rights secured by the First Amendment have been invaded but whether the agencies kept a record on how such rights were exercised. The threshold inquiry under Subsection (e)(7) is whether the agency "maintains a record describing" activity of the subject potentially implicating the First Amendment;[67] only if so will courts proceed to determine whether the activity depicted therein merits constitutional protection.[68] When that approach is utilized, Reuber's claim stumbles at the starting gate, for the letter of reprimand does not amount to a proscribed record of expressional speech activity.[69]

█ The term "record" is defined in the Privacy Act as encompassing "any item, collection, or grouping of information about an individual that is maintained by an agency ... and contains his name[,] ... identifying number, symbol, or other identifying particular...."[70] Since the letter clearly identifies Reuber by name and address,[71] it unmistakably constitutes a record for Privacy Act purposes.

The next step under Subsection (e)(7) is to determine whether the record "describe[s] how" Reuber engaged in First Amendment activity.[72] Since Congress has not elaborated upon this critical phase of the injury, we look to judicial precedents for guidance. In *Albright I*,[73] we considered Subsection (e)(7)'s applicability to a videotape made during a meeting attended by Social Security Administration analysts. The videotape, which depicted the employ-

63. 5 U.S.C. § 552a(e)(7) (1982).

64. *Id.*

65. *Reuber v. United States, supra* note 2, at 30, J.App. 89.

66. *Id.,* J.App. 89.

67. 5 U.S.C. § 552a(e)(7) (1982); see, e.g., *Albright v. United States (Albright I)*, 203 U.S.App. D.C. 333, 338, 631 F.2d 915, 920 (1980); *Clarkson v. IRS,* 678 F.2d 1368, 1374 (11th Cir.1982).

68. See *Albright I, supra* note 67, 203 U.S.App. D.C. at 338, 631 F.2d at 920 ("[t]he threshold issue in this regard is whether the video tape is a record"); see also *MacPherson v. IRS,* 803 F.2d 479, 481 (9th Cir.1986); *Boyd v. Secretary of the Navy,* 709 F.2d 684, 686 (11th Cir.1983); *Clarkson v. IRS, supra* note 67, 678 F.2d at 1375.

69. Since we dispose of Reuber's subsec. (e)(7) claim in this manner, we need not consider the District Court's ruling that his expression of views on malathion were not worthy of First Amendment protection. We note, however, that the court adverted in its disposition to *Connick v. Meyers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (holding that a state has enhanced power to regulate speech by those in its employ). *Connick* would bear relevance to the present case only if we were to conclude that Reuber, an employee of Litton Industries performing services for NCI, should be deemed the functional equivalent of a federal employee for purposes of assessing the governmental interest in regulating his speech. As noted, our disposition of Reuber's claim obviates the need to make that determination.

70. 5 U.S.C. § 552a(a)(4) (1982).

71. Letter from Michael G. Hanna to Melvin D. Reuber, *supra* note 15, at 1, J.App. 941.

72. 5 U.S.C. § 552a(e)(7) (1982).

73. *Supra* note 67.

ees strenuously objecting to agency poli-cies, ostensibly was to be used to explain to analysts not in attendance what had tran-spired at the meeting.[74] We held that the videotape was "a record of the exercise of First Amendment rights, and its creation violates subsection (e)(7)."[75] We empha-sized that the videotape "showed employ-ees complaining to their employer about work-related grievances,"[76] an activity clearly within the First Amendment's scope.[77] Beyond peradventure, it was the portrayal of the employees airing their grievances that was the gravamen of the violation of Subsection (e)(7).

In *Clarkson v. IRS*,[78] there was a chal-lenge to a practice of the Internal Revenue Service of maintaining surveillance reports, newsletters, and press accounts document-ing Clarkson's disenchantment with federal taxation.[79] The Eleventh Circuit declared that "it cannot be disputed that memoranda *reflecting the contents* of Clarkson's politi-cal speech would be subject to First Amendment protection,"[80] and held that "to the extent that the IRS has engaged in the practice of collecting protected informa-tion" unrelated to law enforcement, "sub-section (e)(7) of the Act has been violat-ed."[81]

Perhaps more to the point is the Elev-enth Circuit's decision in *Boyd v. Secretary of the Navy*.[82] Boyd, a civilian employee of the Navy, sent letters to his supervisors complaining about training programs,[83] and on one occasion sent a letter directly to his department head. His supervisors drafted a memorandum remonstrating him for by-passing the normal chain of command and placed a copy of the reprimand in his per-sonnel file.[84] The court, addressing Boyd's claim that the memorandum was an in-fringement of Subsection (e)(7), held that the memorandum "did not implicate Boyd's First Amendment right," in part because "[t]he memorandum did not discuss *the contents* of his prior memos...."[85]

It is in this important regard that Reu-ber's claim must fail. There is no question that Reuber engaged in communicative ac-tivity when he formulated and disseminat-ed his views on the carcinogenicity of mala-thion, nor is there doubt that it was this activity that precipitated the rebuke by his employer.[86] But the sole record main-tained by agencies functioning under the strictures of the Privacy Act—the letter of reprimand itself—makes but scant refer-ence to the specifics of these underlying events. To be sure the letter reveals that Hanna was bitterly disappointed with Reu-ber's putative indiscretions, and believed that substantial injury would flow there-from.[87] But the letter makes not a single reference to the content of Reuber's posi-tion on malathion, and only vague allusions to the manner in which he expressed his views. Since the letter does not "describe how" Reuber engaged in arguably protect-ed activity, its retention by the agencies did not run afoul of the proscription of Subsec-tion (e)(7).[88]

**74.** 203 U.S.App.D.C. at 339, 631 F.2d at 921.

**75.** *Id.*

**76.** *Id.*

**77.** See *Branti v. Finkel,* 445 U.S. 507, 515–516, 100 S.Ct. 1287, 1293, 63 L.Ed.2d 574, 581–582 (1980); *Givhan v. Western Line Consol. School Dist.,* 439 U.S. 410, 414, 99 S.Ct. 693, 695–696, 58 L.Ed.2d 619, 623 (1979).

**78.** *Supra* note 67.

**79.** 678 F.2d at 1372.

**80.** *Id.* at 1374 (emphasis added).

**81.** *Id.* at 1375.

**82.** 709 F.2d 684 (11th Cir.1983).

**83.** *Id.* at 685.

**84.** *Id.* at 685–686.

**85.** *Id.* at 687 (emphasis added).

**86.** See notes 9–17 *supra* and accompanying text.

**87.** Letter from Michael G. Hanna to Melvin D. Reuber, *supra* note 15, J.App. 941–943.

**88.** Since we conclude that the reprimand letter was not a "record describing how [Reuber] exer-cise[d] rights guaranteed by the First Amend-ment," we need not determine whether mainte-nance of the record was otherwise sanctioned under one of the exemptions to subsec. (e)(7). See 5 U.S.C. § 552a(e)(7) (1982) (maintenance of records of First Amendment expression al-lowable if "expressly authorized by statute or by

■ There is, too, another ground demanding denial of Reuber's claim under Subsection (e)(7). The Privacy Act authorizes an award for damages under that subsection only for an "intentional or willful" agency violation.[89] The degree of culpability required is somewhat greater than gross negligence;[90] damages will be assessed against an agency for "committing [an] act without grounds for believing it to be lawful, or ... flagrantly disregarding others' rights under the Act."[91] Reuber points out that the District Court made no findings respecting intentional or willful conduct, and suggests that we either remand for such findings or declare the agencies' putative transgressions intentional or willful as a matter of law.[92] We hold, instead, that the record falls short of establishing unlawful intent or willfulness. There is no evidence tending to show that the agencies' maintenance of the letter was anything other than a good-faith effort to preserve an unsolicited and possibly useful piece of information. This absence of proof leads us to conclude that the actions of the Government in this case, however disjointed or confused, were neither willful nor deliberate in the sense demanded by the Privacy Act,[93] thus Rebuer's (e)(7) claim must fail.[94]

### III. THE AGENCIES' APPEAL

The agencies cross-appeal from the District Court's denial of their motion for partial summary judgment.[95] Before trial, HHS offered to destroy all copies of the reprimand letter in its possession,[96] but Reuber rejected this overture, insisting that the agency also declare that the letter was being eliminated from its records because it was false and defamatory. HHS then moved for summary judgment on Reuber's claims under Subsections (d)(2) and (d)(3).[97] HHS reasoned that since elimination of the letter from the records was the only sought-after relief to which the Privacy Act entitled Reuber, the proposal to destroy the letter mooted any claim based upon its alleged inaccuracy.[98] The District Court, however, ruled that this "reading of the remedies available under the Privacy Act [was] too narrow,"[99] and permitted Reuber's claims to go forward to trial.

### A. *The Act*

The Privacy Act specifies in pertinent part that

[e]ach agency that maintains a system of records shall—

.  .  .  .  .

(2) permit the individual to request amendment of a record pertaining to him and—

.  .  .  .  .

(B) promptly, either—

(i) make any correction of any portion thereof which the individual believes is not accurate, relevant, timely, or complete; or

(ii) inform the individual of its refusal to amend the record in accordance with

the individual about whom the record is maintained or ... pertinent to and within the scope of an authorized law enforcement activity").

**89.** 5 U.S.C. § 552a(g)(4) (1982).

**90.** *Hill v. United States Air Force,* 254 U.S.App. D.C. 171, 795 F.2d 1067 (1986); *Parks v. IRS,* 618 F.2d 677, 683 (10th Cir.1980).

**91.** *Albright II, supra* note 40, 235 U.S.App.D.C. at 303, 732 F.2d at 189 (footnote omitted).

**92.** Brief for Appellant at 17–18.

**93.** *Perry v. Block,* 221 U.S.App.D.C. 347, 355, 684 F.2d 121, 129 (1982).

**94.** See *Hill v. United States Air Force, supra* note 90, 254 U.S.App.D.C. at 174, 795 F.2d at 1070;

*Albright II, supra* note 40, 235 U.S.App.D.C. at 304, 732 F.2d at 190.

**95.** See *Reuber v. United States, supra* note 25, J.App. 51.

**96.** At the time of the summary judgment motion, Reuber's complaint had not been amended to include EPA as a defendant. See *id.* at 8, J.App. 58. Eventually, EPA joined in the offer to expunge the record. *Reuber v. United States, supra* note 2, at 31 n. 70, J.App. 90 n. 70.

**97.** 5 U.S.C. §§ 552a(d)(2), (d)(3) (1982).

**98.** *Reuber v. United States, supra* note 25, at 1–2, J.App. 51–52.

**99.** *Id.* at 4, J.App. 54.

his request, the reason for the refusal, the procedures established by the agency for the individual to request a review of that refusal by the head of the agency or an officer designated by the head of the agency, and the name and business address of that official;

(3) permit the individual who disagrees with the refusal of the agency to amend his record to request a review of such refusal ... and if, after his review, the reviewing official also refuses to amend the record in accordance with the request, permit the individual to file with the agency a concise statement setting forth the reasons for his disagreement with the refusal of the agency, and notify the individual of the provisions for judicial review of the reviewing official's determination under subsection (g)(1)(A) of this section....[100]

Subsection (g) confers the privilege of judicial review, as follows:

*(1) Civil remedies.* Whenever any agency

(A) makes a determination under subsection (d)(3) of this section not to amend an individual's record in accordance with his request, or fails to make such review in conformity with that subsection;

. . . . .

the individual may bring a civil action against the agency, and ...

(2)(A) ... the court may order the agency to amend the individual's record in accordance with his request or in such other way as the court may direct. In such a case the court shall determine the matter de novo.[101]

The conclusion Reuber draws from these provisions is that "[t]he Act itself gives individuals a statutory right to have false records about them destroyed on the ground that they are false."[102] Reuber relies upon the words "any correction" and "in accordance with his request" in the statutory language, and terms the proposal to destroy all copies of the letter in its possession a mere "tactical offer."[103]

The District Court adopted this interpretation of the Act, holding that because Reuber had demanded a concession regarding the accuracy of the letter, simply destroying it would not accord with Reuber's request.[104] Referring to Subsection (g)(2)(A), the court said:

The plain meaning of the phrase "to amend" in no way suggests that the court's power is limited to ordering deletion of records. On the contrary, the expression "in such other ways as the court may direct" implies a broader power in the court to order affirmative correction of records where appropriate, and not just their deletion, to effectuate the purposes of the Act.[105]

We have no quarrel with this statement of the law,[106] but we deny its relevance to this case. Reuber has not sought amendment or correction of his records, which a court would clearly have authority to order;[107] rather, he has insisted that the letter of reprimand be destroyed, but "on the ground that it is false."[108] Moreover, because the record in question is a letter from one nongovernmental party to another, amendments, even if undertaken, would

---

100.  5 U.S.C. § 552a(d) (1982).

101.  *Id.* § 552a(g).

102.  Reply Brief for Appellant at 41.

103.  *Id.*

104.  *Reuber v. United States, supra* note 25, at 4–5, J.App. 54–55.

105.  *Id.* at 4, J.App. 54.

106.  See, e.g., *Vymetalik v. FBI,* 251 U.S.App.D.C. 402, 410 n. 12, 785 F.2d 1090, 1098 n. 12 (1986) (noting that the Act "guarantees an individual

the right to demand that his or her records be amended if inaccurate").

107.  At one point Reuber does argue that the agencies have attempted to deprive him of his rights "by offering to destroy the records without correcting them." Reply Brief for Appellant at 43 n. 18. This formulation, implying that records require purification before they can be eliminated, strikes us as erroneous. Correction and deletion are more logically viewed as mutually exclusive remedies; a record is worth amending only if it is to be retained, at least for a while.

108.  *Id.* at 45.

be awkward to accomplish. The agencies could hardly be expected to scratch out Hanna's offending lines and pencil in Reuber's proffered substitutes. A reasonable measure might be inclusion with the letter in the files of a statement of Reuber's views of the matters Hanna addressed,[109] but after destruction of the letter the accompanying commentary would seem to work a distortion rather than a correction. Though we do not doubt our authority to grant relief in the nature of an appropriate amendment, we emphasize that Reuber has not requested it.

■ Reuber's actual demand—that the letter be destroyed on the ground that it is false—appears to envision some sort of determination and announcement by the agencies that the letter was inaccurate. Aside from the impracticality of making and preserving this determination, a matter upon which we have commented, we are left with the question whether Reuber is entitled to that remedy—that is, whether Reuber can thrust upon the agencies, which did not author the letter of reprimand, the responsibility for investigating and assessing charges in the letter even after the agencies have disclaimed any interest in keeping it on file. We do not believe the Privacy Act requires of federal agencies such an extraordinary effort.

■ Certainly nothing in the Act itself compels that result. Both Reuber and the District Court have attached particular significance to the statutory language "in accordance with his request."[110] The request itself must be statutorily authorized before an agency becomes bound to honor it. Put another way, if an agency erroneously refuses upon request by an interested party to delete a record, or to alter a record by inserting or redacting material, a reviewing court may order the agency to comply with the terms of the request exactly. But a party requesting procedures not mandated by the act is not entitled to complete satisfaction; instead he too is guaranteed only those remedies which the law prescribes. Thus, the agencies' failure to oblige Reuber is of no consequence if his demand falls outside the scope of the Act.

The agencies have consulted the legislative history and provided a detailed account of the genesis of the "in accordance with his request" provision,[111] concluding that Congress "did not intend to impose a requirement on the government to determine the accuracy of records it did not intend to use or keep."[112] We agree with the agencies, though we confess that the legislative history of this particular phrase adds little to our understanding of it.[113] The modest evolution of the phrase [114] simply confirms

109. See 5 U.S.C. § 552a(d)(3) (1982).

110. See text at notes 103–105 *supra*.

111. See Brief for Appellees at 41–44.

112. *Id.* at 44.

113. One commentator, noting the "legislative chaos" preceding enactment of § 552a, has glumly observed that "[t]he consequence of this hasty and haphazard legislative process is an internally inconsistent statute with no reliable indication of congressional intent." Note, *The Privacy Act of 1974: An Overview and Critique*, 1976 Wash.U.L.Q. 667, 679, *reprinted in Guidebook to the Freedom of Information and Privacy Act* 39, 45 (R. Bouchard & J. Franklin eds. 1980).

114. The House Report offers little that is not contained in the Act itself. Referring to § 552a(d), the House Committee asserted that an agency's duty is to consider "any correction

of the documents which the individual requests," H.R.Rep. No. 1416, 93d Cong., 2d Sess. 14 (1974), and that the purpose of the phrase was to "[e]nsur[e] that individuals know what Federal records are maintained about them and have the opportunity to correct those records." *Id.* at 15.

In the Senate, a competing version, contained in S. 3418, would have required agencies to "investigate" claims such as Reuber's and "correct or eliminate any information that is found to be incomplete, inaccurate, not relevant, not timely or necessary to be retained, or which can no longer be verified." S. 3418, 93d Cong., 2d Sess. § 201(d)(2) (1974), *reprinted in Legislative History of the Privacy Act of 1974* 134 (1976) [hereinafter *Legislative History* ]. The bill would have gone beyond the eventual enactment by granting disgruntled individuals an opportunity for a hearing at which evidence would be accepted and cross-examination of witnesses permitted. *Id.* § 201(d)(2)(F), *Legislative History, supra*, at 135. But even this proto-Privacy Act—which, of course, Congress did not adopt, reserved to the agency the initial choice be-

our judgment that the wide-ranging fact-finding mission advocated by Reuber was not the congressional model of agency action under the Privacy Act.

## B. *Caselaw*

Precedent on this important question is scarce, but the case most closely analogous supports the agencies' contentions. In *Metadure Corp. v. United States,*[115] the plaintiffs alleged that the Department of Defense and other agencies were maintaining in their files copies of an anonymous memorandum denigrating the plaintiffs' status as government contractors. They brought suit under the Privacy Act in an effort to obtain both damages and an injunction ordering the agencies to "cure" the violations. The plaintiffs also sought discovery of the identity of the author of the memorandum, but the court ruled that the Privacy Act conferred no such right.[116] After the agencies either destroyed or offered to destroy their copies of the memorandum, the court granted summary judgment in their favor on the ground that destruction constituted "precisely the relief to which [the] plaintiff was entitled under the Privacy Act."[117] *Metadure* holds squarely that document destruction, if feasible, is the ultimate relief available in a Privacy Act suit challenging the accuracy of agency records.

None of the other cases around which this portion of the litigation has revolved is instructive. The District Court cited *Clarkson v. IRS,*[118] but that decision stands for no more than the unremarkable proposition that a reviewing court has authority to order "the amendment or expungement of all records which are maintained in violation of subsection (e)(7)," [119] whether or not they are contained within a system of records. Reuber relies heavily on *R.R. v. Department of the Army,*[120] but that case is also inapposite. There, the plaintiff brought a Privacy Act suit to correct alleged errors in his Army medical records. The Army had refused to make amendments requested, asserting that its original findings of preexisting schizophrenia were "more persuasive." [121] The pivotal question was whether the provisions of the Act compelling correction of inaccurate records applied solely to "factual misrepresentations" or extended to comprehended medical judgments as well. The court found the Army to be in error; "[a]n agency," it said, "may not refuse a request to revise or expunge prior professional judgments once all the facts underlying such judgments have been thoroughly discredited." [122] We agree that if the agencies here desired to *retain* the letter reprimanding Ruber, they could not ignore any possibly persuasive evidence of falsity simply by contending that it resulted from the subjective professional opinions of Dr. Hanna. Beyond that, *R.R.* has no application to the instant case.[123]

Finally, Reuber claims that our decision in *Chastain v. Kelley* [124] establishes, independently of the Privacy Act, a right to

---

118. *Supra* note 67; see *Reuber v. United States, supra* note 25, at 4, J.App. 54.

119. *Clarkson v. IRS, supra* note 67, 678 F.2d at 1376.

120. 482 F.Supp. 770 (D.D.C.1980).

121. *Id.* at 772.

122. *Id.* at 774.

123. Similarly off point is another decision invoked by Reuber, *Murphy v. NSA,* 2 Gov't Discl. Serv. (P–H) § 81,389 (D.D.C.1981) (rejecting agency's argument that records incorporating medical opinion are not subject to expungement under the Privacy Act).

124. 167 U.S.App.D.C. 11, 510 F.2d 1232 (1975).

tween correction and elimination of records, and was not intended "to require an agency to extend its investigative powers beyond its statutory jurisdiction or beyond the reach of its fiscal and administrative resources." S.Rep. No. 1183, 93d Cong., 2d Sess. 61 (1974), *reprinted in* [1974] U.S.Code Cong. & Admin.News 6916, 6976. Reuber's broad interpretation of § 552a not only would rob the agency of its option to either correct or eliminate, but also would result in just such an agency overextension, and would do so pursuant to a statute less expansive than the early S. 3418.

115. 490 F.Supp. 1368 (S.D.N.Y.1980).

116. *Id.* at 1375.

117. *Id.*

relief. Again, we strongly disagree. Chastain, an agent of the Federal Bureau of Investigation, was suspended and threatened with dismissal for alleged misconduct, whereupon he brought suit to enjoin the agency from disciplining him. Later, however, the suspension was terminated and Chastain was restored to his former status. The District Court dismissed the case as moot and granted Chastain's unopposed motion for an order requiring the FBI to expunge all records relating to the incident and to inform other agencies cognizant of the matter that the charges had been dropped. After the FBI tardily sought to oppose the motion for the expungement order, this court vacated that order to enable the District Court to consider the FBI's objections. This court's opinion contains the following statement:

> The part of the challenged order to which we see least objection is that requiring the Bureau to inform other agencies to which it has hitherto disseminated information about this matter that [Chastain] was not in fact disciplined for it. Certainly it is the Bureau's obligation to correct any erroneous information. Since the action the Board [sic] is required to take with respect to other agencies will otherwise depend on what it itself is required to do, however, it seems best to vacate the entire order and to allow the District Court to reexamine— and perhaps to refashion—it in light of what may be revealed by further proceedings.[125]

Taken in context, this statement clearly means simply that an agency has an obligation, not to correct inaccuracies in an expunged record, but to remove misimpressions generated by its own disclosures.

Courts have generally held that the Privacy Act's provisions for injunctive relief are to be narrowly construed.[126] Restraint is particularly important where injudicious

expansion of our supervisory power would impose onerous burdens on federal agencies by making them unwilling arbiters of the truth, even when the dispute is between other parties and the offending document has been purged from governmental offices. We therefore must reject Reuber's interpretation of the Act and reverse the District Court's denial of the agencies' motion for partial summary judgment.

The District Court made four detailed findings of fact concerning the accuracy of the letter of reprimand. First, regarding Hanna's charge that Reuber had improperly bypassed publication clearance procedures, the court concluded that "the ... letter is incorrect on a serious allegation: Dr. Reuber did not breach his contract, Frederick policy, NCI policy, or professional standards by failing to submit his non-Frederick papers to internal review."[127] Turning to the accusation that Reuber's slide examinations at Tracor Jitco were either far fewer than he had claimed or too cursory to support his scientific conclusions, the court found that the evidence bore out the charge.[128] The court also approved the letter's contention that Reuber had spent "excessive" time at Tracor Jitco.[129] Lastly, the court decided that, although Reuber had not misled the scientific community by using his Frederick address on his private papers, the evidence tended to support the allegation that Reuber was guilty of unprofessional conduct and misrepresentation for circulating his paper on malathion to laymen, who might fail to appreciate the distinction between individual and institutional work-product.[130]

These findings were based on the District Court's careful analysis of the evidence presented at trial. Regrettably, this labor was wasted, since the agencies' motion for partial summary judgment should have been granted. The determination of

---

**125.** *Id.* at 16, 510 F.2d at 1237.

**126.** See, e.g., *Parks v. IRS, supra* note 90, 618 F.2d at 684; *Edison v. Department of Army,* 672 F.2d 840, 846–847 (11th Cir.1982).

**127.** *Reuber v. United States, supra* note 2, at 16, J.App. 75.

**128.** *Id.* at 16–18, J.App. 75–77.

**129.** *Id.* at 18, J.App. 77.

**130.** *Id.* at 18–21, J.App. 77–80.

the truthfulness of the letter was necessary only to the court's disposition of Reuber's (d)(2) and (d)(3) claims; if these claims had been dismissed as moot before trial, as properly they should have been, there would have been no occasion to rule on the accuracy of the letter at all. We therefore vacate this portion of the District Court's judgment and remand with instructions to dismiss as moot Reuber's claims based on alleged inaccuracy of the letter.[131]

### IV. Conclusion

We are not insensitive to Reuber's complaints; indeed, we are satisfied that he believes his traumas have been due in no small part to governmental malfeasance. The Privacy Act, however, simply was not designed to create a remedy for every instance in which an individual's grievance tangentially concerns a federal agency. The judgment of the District Court is affirmed in part and reversed in part, as hereinbefore set forth, and the case is remanded to that court for further proceedings consistent with this opinion.

*It is so ordered.*

---

**131.** Reuber urges us to vacate also all other factual findings of the District Court not specifically affirmed on this appeal. See Brief for Appellant at 73–75. His fear is that some of these findings may be given preclusive effect in subsequent litigation. See *id.* at 74–75.

Ordinarily, when a case becomes moot on appeal, we dismiss the appeal and vacate the judgment appealed from. E.g., *United States v. Munsingwear,* 340 U.S. 36, 39–41 & n. 2, 71 S.Ct. 104, 106–107 & n. 2, 95 L.Ed. 36, 40–42 & n. 2 (1950); *Aviation Enters., Inc. v. Orr,* 230 U.S. App.D.C. 285, 289–290, 716 F.2d 1403, 1407–1408 (1983). Since, however, the instant case did not become moot on appeal, this practice is clearly inapplicable. The discrete findings as to accuracy of the letter of reprimand were made only because the District Court erred in denying the agencies' motion for partial summary judg-

ment, and our vacatur of those findings differs substantially from the action Reuber requests.

In unusual circumstances, relief of this general type may be provided, see e.g., *Electrical Fitting Corp. v. Thomas & Betts Co.,* 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263 (1939) (vacating finding of patent validity because District Court had dismissed complaint on noninfringement grounds), but here Reuber would have us perform a wholesale reexamination of the District Court's findings to determine which were necessary to some portion of the judgment appealed from and which were purportedly gratuitous. We decline the invitation to engage in such tinkering. See *AT & T v. FCC,* 195 U.S.App.D.C. 223, 233, 602 F.2d 401, 411 (1979). Determinations of the preclusive effect of these findings must be made in the first instance by trial courts.