Melvin D. REUBER, Plaintiff–Appellee,

v.

FOOD CHEMICAL NEWS, INC.;
Defendant–Appellant,

and

Litton Industries, Inc.; Litton Bionetics, Inc.; Vincent T. Devita, Jr., National Cancer Institute, National Institute of Health; Richard Adamson, National Cancer Institute, National Institute of Health; William V. Hartwell, National Cancer Institute, National Institute of Health; William Payne, Frederick Cancer Research Center; Michael G. Hanna, Jr., Frederick Cancer Research Center; James C. Nance, Litton Bionetics, Inc.; I.J. Fidler, Frederick Cancer Research Center; United States of America; U.S. Department of Health & Human Services; Environmental Protection Agency, Defendants,

The Newsletter Association; Maryland–Delaware–District of Columbia Press Association; National Association of Broadcasters; The Radio–Television News Directors Association; The Reporters Committee for Freedom of the Press; Washington Merry–Go–Round, Inc.; The Washington Post, Amici Curiae.

Melvin D. REUBER,
Plaintiff–Appellant,

v.

LITTON INDUSTRIES, INC.; Litton Bionetics, Inc.; Vincent T. Devita, Jr., National Cancer Institute, National Institute of Health; Richard Adamson, National Cancer Institute, National Institute of Health; William V. Hartwell,

National Cancer Institute, National Institute of Health; William Payne, Frederick Cancer Research Center; Michael G. Hanna, Jr., Frederick Cancer Research Center; James C. Nance, Litton Bionetics, Inc.; I.J. Fidler, Frederick Cancer Research Center; U.S. Department of Health & Human Services; Environmental Protection Agency, Defendants–Appellees,

and

United States of America; Food Chemical News, Inc., Defendants,

The Newsletter Association; Maryland–Delaware–District of Columbia Press Association; National Association of Broadcasters; the Radio–Television News Directors Association; the Reporters Committee for Freedom of the Press; Washington Merry–Go–Round, Inc.; The Washington Post, Amici Curiae.

Melvin D. REUBER, Plaintiff–Appellee,

v.

LITTON INDUSTRIES, INC.; Litton Bionetics, Inc.; Michael G. Hanna, Jr., Frederick Cancer Research Center; James C. Nance, Litton Bionetics, Inc.; I.J. Fidler, Frederick Cancer Research Center, Defendants–Appellants,

and

Vincent T. Devita, Jr., National Cancer Institute, National Institute of Health; Richard Adamson, National Cancer Institute, National Institute of Health; William V. Hartwell, National Cancer Institute, National Institute of Health; William Payne, Frederick Cancer Research Center; United States of America; U.S. Department of Health & Human Services; Environmental Protection Agency; Food Chemical News, Inc., Defendants,

The Newsletter Association; Maryland–Delaware–District of Columbia Press Association; National Association of Broadcasters; The Radio–Television News Directors Association; The Reporters Committee for Freedom of the Press; Washington Merry–Go–Round, Inc.; The Washington Post, Amici Curiae.

Nos. 88–2641—88–2643.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 30, 1989.

Decided March 20, 1990.

As amended April 5, 1990.

Frances E. Kanterman, Leonard E. Cohen (Frank, Bernstein, Conaway & Goldman, on brief), Aaron L. Handleman (Melissa Chappell–White, Laxalt, Washington, Perito & Dubuc, on brief) for appellants.

Raymond Donald Battocchi (Isaac N. Groner, Walter H. Fleischauer, Cole and Groner, P.C., on brief), Gerald P. Greiman (Green, Hoffmann & Dankenbring, Roger C. Spaeder, Leslie A. Blackmon, Zuckerman, Spaeder, Goldstein, Taylor & Kolker, Alphonse M. Alfano, Bassman, Mitchell & Alfano, E. Grey Lewis, McDermott, Will & Emery, on brief) for appellees.

(Lee Levine, James E. Grossberg, Ross, Dixon & Masback, Henry L. Baumann, Steven A. Bookshester, J. Laurent Scharff, Pierson, Ball & Dowd, Jane E. Kirtley, Boisfeuillet Jones, Jr., Barbara P. Percival, on brief), for amici curiae.

Before WILKINS, Circuit Judge, WINTER, Senior Circuit Judge, and HARVEY, Chief United States District Judge for the District of Maryland, sitting by designation.

HARRISON L. WINTER, Senior Circuit Judge:

These consolidated appeals raise myriad issues, but the principal ones concern the law of defamation and invasion of privacy.

## I. Introduction

In 1981 the plaintiff Melvin Reuber worked for Litton Bionetics, Inc. (Litton), a private research firm, as a pathologist researching the potential carcinogenic effects

of various chemicals.[1] Litton operated the Frederick Cancer Research Center ("FCRC") under a contract with the National Cancer Institute ("NCI"), a public agency. In addition to his official duties, Reuber performed a substantial amount of independent research on his own time. He used his access to data from other NCI studies to produce his own evaluation of the results.

As part of his private research, Reuber had reanalyzed bioassays concerning the potential carcinogenic effects of the chemical malathion (an insecticide). An official NCI report concluded that the bioassays did not show the chemical to cause cancer, but Reuber's independent work led him to believe that malathion might be carcinogenic. He reported this result in an unpublished manuscript. A California environmental group, which had previously requested a copy of the manuscript from Reuber, began using the paper in its opposition to the use of malathion in combatting the infestation of Mediterranean fruit flies ("Medflys") in 1980–81. While the paper was based on Reuber's private work, he had placed his office address on the manuscript, which indicated that he was associated with the FCRC and the NCI.[2]

The use of the malathion manuscript created some confusion over the official NCI position on the potential carcinogenic effects of the insecticide and prompted inquiries. As a result, Drs. Vernon Hartwell and Richard Adamson, two NCI executives, contacted Dr. Michael Hanna, Reuber's supervisor at Litton, and urged him to investigate Reuber's activities. After consulting with a number of NCI and Litton employees, Dr. Hanna convinced Reuber to mail errata letters to journals that had published papers based on his private research to clarify that they were not official FCRC or NCI reports.

Hanna believed that he should also impose a sanction on Reuber. On March 26, 1981, Hanna wrote a scathing letter of reprimand (the "Hanna letter") in which he asserted that Reuber had committed the following professional misconduct:

1. knowingly and wrongly bypassing FCRC/NCI clearance procedures when publishing papers and circulating manuscripts based on his independent research,

2. admitting that he bypassed those FCRC/NCI clearance procedures because the papers were of insufficient quality to merit approval,

3. either lying about the extent of his research on the chemical malathion or spending too little time analyzing the results to support scientific conclusions,

4. spending an excessive amount of time away from his work, and

5. using the name of the FCRC and the NCI without authorization.

Hanna sent the letter of reprimand to Reuber with copies to James Nance and Dr. Fidler at Litton and Drs. Adamson, DeVita, Hartwell and Payne at NCI. Reuber has been unable to prove who leaked the Hanna letter to the outside, but it is clear that Dr. William Hollis of the National Agricultural Chemicals Association received a copy of the letter from an anonymous source on April 13, 1981.[3] Hollis sent a copy to Jack Wise of Stauffer Chemical Company. Wise contacted Catherine Cooper, the editor of the Pesticide and Toxic Chemical News ("PTCN").[4] On April 15, after making "a conscious decision not to inquire into whether the statements contained in [the letter] were true or false," Cooper published an article about the repri-

---

1. We treat Litton Industries, Inc., and its subsidiary, Litton Bionetics, Inc., as one entity for the purposes of this appeal.

2. Reuber's other contact with the Medfly controversy in California consisted of responding to a reporter's questions over the phone and sending a private letter to the Director of the California Department of Food and Agriculture Richard Rominger. In the letter, Reuber explained why the department should place more weight on his results than those of the official NCI report.

3. Some evidence exists that a copy also appeared on an EPA bulletin board.

4. The publication is owned by the defendant Food Chemical News.

mand, reproducing most of the contents of the Hanna letter.

Reuber resigned from Litton on April 24, 1981, on the advice of his physician. He has not found regular employment in his field of study since that time.

In 1981 Reuber filed suit in the District of Columbia against the United States, the Department of Health and Human Services ("HHS"), and the Environmental Protection Agency ("EPA") based on the Privacy Act and the Federal Tort Claims Act. Reuber also sued Food Chemical News (the "News"), Litton Industries, Inc. and its subsidiary Litton Bionetics, Inc., four individuals employed by the NCI ("NCI employees"), and three employees of Litton ("Litton employees") for violations of his rights under the First and Fifth Amendments to the U.S. Constitution and for violation of his common law rights against defamation, invasion of privacy, conspiracy, breach of contract, negligence, interference with business and contractual relationships, and intentional and/or negligent infliction of emotional distress.[5]

The district judge severed Reuber's claims against the government, dismissed the First and Fifth Amendment claims against the government, and held a bench trial on the Privacy Act claims in 1984. Reuber lost most of these claims, and, on appeal, the District of Columbia Circuit held that the district court should have granted summary judgment against Reuber on all of his Privacy Act claims. *Reuber v. United States*, 829 F.2d 133 (D.C.Cir. 1987).

The district judge also dismissed Reuber's First Amendment claims against all other defendants in 1982. On appeal, the District of Columbia Circuit reinstated Reuber's First Amendment claims against Litton and affirmed dismissal of Reuber's claims against all individual defendants for lack of personal jurisdiction. *Reuber v. United States*, 750 F.2d 1039 (D.C.Cir. 1984).

In 1982 Reuber filed a similar set of claims in Maryland state court against Lit-

ton and the seven individuals named in the District of Columbia suit. This suit was removed to federal court. After the decision of the District of Columbia Circuit in 1984, the District of Columbia case (except for the claims involving the United States) was transferred to the United States District Court for the District of Maryland and consolidated with the Maryland suit. These several appeals are from that consolidated action.

In 1986 the magistrate to whom the case had been referred recommended granting summary judgment in favor of Litton on Reuber's First Amendment claims. While the District of Columbia Circuit had reversed the dismissal of Reuber's First Amendment claim against Litton, the magistrate ruled that the District of Columbia district court's subsequent disposition of the Privacy Act claims against the U.S. collaterally estopped Reuber from pursuing his claims against Litton. In the alternative, the magistrate also granted summary judgment against Reuber on his First Amendment claims on the grounds that the individual defendants were entitled to qualified immunity as federal officials. He held that immunity applied in this case because Reuber's First Amendment rights were not "clearly established" at the time of the alleged violation.

On the common law claims against Litton and the individuals employed by Litton, the magistrate recommended a bifurcated trial with the first part focusing on whether any Litton employees leaked the Hanna letter. The magistrate reasoned that if the Litton employees did not leak the letter, then they were entitled to immunity as federal officials acting within the scope of their authority. Reuber stipulated that he could not prove who had leaked the letter, so the common law claims against Litton and its employees were dismissed.

The district judge adopted the magistrate's recommendations and set trial for Reuber's common law claims against Food Chemical News. Litton moved for sanc-

---

**5.** Reuber abandoned his Fifth Amendment claims and his breach of contract claims against all defendants, and we do not address them here.

tions against Reuber under Rule 11, Fed.R. Civ.P., but the court denied the motion.

At the trial against the News, the judge instructed the jury on defamation and invasion of privacy. The jury answered the following special verdict interrogatories:

1. Do you find that the defendant, Food Chemical News, Inc., is liable to the plaintiff, Dr. Reuber, for having negligently published a false article about him?

Jury: No

2. Do you find that the News is liable to the plaintiff for having invaded his privacy?

Jury: Yes

3. Do you find that the News acted with "actual malice" as the Court has defined that term for you?

Jury: Yes

The jury awarded Reuber $500,000 in compensatory damages and $250,000 in punitive damages.

The parties immediately realized that the jury verdict was ambiguous. In answering the first interrogatory, the jury could have meant that (1) the letter, and thus the News article, did not contain false statements, (2) even if the letter contained false statements, the article presented a fair and accurate account of the letter, or (3) the News was more than just negligent in publishing a false article, it acted with actual malice. In response to a second set of questions, the jury specifically found that the Hanna letter and the News article contained "one or more" false statements. On the basis of this finding, the district judge entered judgment against the defendant for defamation as well as for invasion of privacy. In a third and final round of questions, the jury indicated that being told that the News was liable for both defamation and invasion of privacy changed its assessment of compensatory damages. It then increased the compensatory damage award from $500,000 to $625,000.

The appeals consolidated for argument and decision are three in number: (1) the News appeals the judgment against it for defamation and invasion of privacy (No. 88–2641), (2) Reuber appeals the dismissal of his claims against Litton, the Litton employees, and the NCI employees (No. 88–2642), and (3) Litton appeals the denial of sanctions against Reuber under Rule 11 (No. 88–2643). We affirm the disposition of all claims, albeit for reasons different in some cases from those assigned by the district court.

## II. Food Chemical News (No. 88–2641)

### 1. *Defamation*

We turn first to the claim for defamation against the News. In reviewing a defamation claim involving the First Amendment, we must "examine for ourselves the statements in issue and the circumstances under which they were made to see … whether they are of a character which the principles of the First Amendment … protect." *New York Times Co. v. Sullivan*, 376 U.S. 254, 285, 84 S.Ct. 710, 728–29, 11 L.Ed.2d 686 (1964). We can affirm the verdict against the News only after assuring "ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression." *Id.* Reuber may recover for defamation if the News article on the reprimand letter contained false statements of fact, the publication caused damage, and one of two things is true: (1) Reuber is a private figure and the News was at least negligent, or (2) Reuber is a public figure and the News acted with actual malice. *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

### a. *False Statements*

■ The jury found that some of the statements in the reprimand letter and the News article were false.[6] Evidence upon

---

**6.** The News argues that because it accurately reported the contents of the reprimand letter, it printed no false statement. It relies on the Maryland privilege to report official actions and contends that it is responsible only for accurately reporting those actions and not for the propriety of the official action itself. Even if the letter is an official action, which it may not be,

which the jury could have reasonably relied shows that Reuber did not knowingly circumvent FCRC/NCI clearing procedures for his private publications as Hanna suggested. In fact, he was specifically told that he did not have to submit papers based on his private research to Litton for clearance. The letter also quotes Reuber out of context to create the false impression that he admitted his papers were substandard. In any event, the News attacks the correctness of the jury's finding that the article contained false statements on several grounds.

■ First, the News argues that the instructions to the jury were erroneous in that they only required a finding that "one or more statements in the article are false and derogatory." The News argues that the jury should have been required to determine whether the entire article was substantially true or false. While we agree that the statements should be viewed in context, we do not find error in the jury instruction. A single false statement may support a defamation claim, regardless of the number of true statements published at the same time, unless the other statements affect the interpretation of the statement at issue. *Cf. Hohman v. A.S. Abell Co.*, 44 Md.App. 193, 407 A.2d 794, 796–97 (1979).[7]

■ In this case, the judge cautioned the jury that "in determining whether such statement is false or derogatory, you must look at the article as a whole." The jury was thus properly instructed to consider the context of the article in deciding whether or not it contained false statements. Even without the instruction, the News article is direct and straightforward, and it is unlikely that the jury mistakenly read something out of context.

■ Next, the News contends that the district judge should have required the jury to identify which statement(s) were false.[8] Without such a specific finding, the News reasons, neither the district court nor this court can determine whether the statements relied upon by the jury were fact or opinion. While a court might have a duty to distinguish carefully facts from opinions for the jury in some cases, this is not such a case. The letter consists of detailed and specific allegations of fact. To the extent that Hanna expressed his opinions, the jury was clearly instructed to consider only factual statements. In addition, the arguments of counsel at trial focused on the factual statements.[9] While the special verdict interrogatories were not models of precision, the responses by the jury suffice to show a finding that the article contained false statements of fact.

### b. Actual Malice

■ We turn next to the jury's finding of actual malice in its response to the first set of interrogatories. Actual malice exists only where the defendant knew that the publication was false or acted with reckless disregard as to its truth or falsity. *New*

7. For example, a false statement might appear in an article, but the context or additional language may indicate that the entire article is satirical. *Cf. Hustler Magazine v. Falwell*, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) (denying a libel claim based on a parody of an advertisement).

this argument goes too far. Reporting the events in a trial or public hearing is a far cry from publishing the contents of a supposedly confidential personnel file. Maryland explicitly recognizes a privacy interest in personnel records. In defining public access to state records, the Maryland Code states that "a custodian shall deny inspection of a personnel record of an individual, including an application, performance rating, or scholastic achievement information." Md.State Gov't Code Ann. § 10–616(h) (1984).

8. The News has not provided any authority supporting the proposition that a jury must specifically identify which statements are false.

9. We note that the News never properly presented this issue to the district court. After the first response from the jury, the defendant took the position that the verdict was fatally inconsistent. When the court proposed submitting clarifying questions, the defendant put its objections on the record. Despite this opportunity to voice objections, the defendant never asked the court either to require the jury to identify which statements were false or to explain to the jury which statements were opinions. Even now, the News does not suggest any statement of opinion in the letter on which the jury may have impermissibly relied.

*York Times*, 376 U.S. at 279–80, 84 S.Ct. at 725–26. The district court correctly instructed the jury that the plaintiff must show actual malice by "clear and convincing" evidence. *Id.* at 285–86, 84 S.Ct. at 728–29.[10] The News argues on appeal that (1) the evidence in the record is insufficient as a matter of law to sustain a finding of actual malice, and (2) the judge improperly allowed the jury to consider deviations from standard journalistic procedures. In appraising the merits of these contentions, we must conduct our own independent evaluation of the evidence to ensure that the jury verdict does not infringe impermissibly on free expression. *Id.* at 285, 84 S.Ct. at 728.

After reviewing the record, we agree with the jury that the plaintiff showed actual malice with clear and convincing evidence.[11] Consideration of the purpose behind the actual malice standard will reveal why the defendant fails to come under its protection. False statements of fact, such as those found in the Hanna letter, do not themselves warrant constitutional protection. Rather, publication of some false statements is afforded constitutional protection in order to prevent a chilling effect on the exchange of ideas and the communication of true statements of fact.[12] Under the actual malice standard, a newspaper attempting in good faith to report accurately information about public officials and public events does not have to fear punishment for mistakes which will inevitably occur.

Nevertheless, the protection granted publishers in *New York Times* does have limits. The First Amendment does not require that "publishers and broadcasters enjoy an unconditional and indefeasible immunity from liability for defamation." *Gertz*, 418 U.S. at 341, 94 S.Ct. at 3007. The actual malice standard provides "breathing space" for free expression, but it leaves room to protect the "legitimate state interest underlying the law of libel [which is to compensate] individuals for the harm inflicted on them by defamatory falsehood." *Id.* at 341–42, 94 S.Ct. at 3008. That interest requires individuals to refrain from publicizing information that they know is false and to avoid reckless indifference as to the accuracy of the report. Publishers who fail to meet even this minimal burden do not warrant protection under the First Amendment because they have reason to know that they should refrain from publishing the statements at issue.

We have independently reviewed the record and agree with the jury that the News failed to meet even the minimal burden of the actual malice standard. The editor of the PTCN, which published the letter, took no steps to ascertain the accuracy of the letter. She only knew that someone in the chemical industry, with a vested interest in discrediting Reuber, claimed to have received the letter from an anonymous source. Despite the fact that it was the most severe letter of reprimand she had ever seen, she did not telephone

---

**10.** We assume, without deciding, that the plaintiff was a limited purpose public figure and apply the actual malice standard to the determination of liability. While the district court instructed the jury on actual malice as a prerequisite only to punitive damages (because the court found that Reuber was a private figure), the standard in Maryland for showing actual malice is the same whether one is a public figure seeking compensatory damages or a private figure seeking punitive damages. *See Embrey v. Holly*, 293 Md. 128, 442 A.2d 966 (1982); *Maryland Civil Pattern Jury Instructions*, 12:7 (2d ed. 1984) (1989 Supp.). In both instances, the *New York Times* standard applies. As a consequence, the jury's finding of actual malice pursuant to a punitive damage instruction satisfies Reuber's burden to show actual malice as a public figure. In any event, the parties did not contest this issue.

**11.** The district judge, who had an opportunity to observe the witnesses, found the evidence of actual malice "overwhelming."

**12.** In *Gertz* the Supreme Court explained that "[n]either the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wideopen' debate on public issues." "Although the erroneous statement of fact is not worthy of constitutional protection, it is nevertheless inevitable in free debate.... And punishment of error runs the risk of inducing a cautious and restrictive exercise of the constitutionally guaranteed freedoms of speech and press.... The First Amendment requires that we protect some falsehood in order to protect speech that matters." *Gertz*, 418 U.S. at 340, 94 S.Ct. at 3007 (citations omitted).

Reuber to get his response or even call Hanna to verify that he had actually written such a letter.[13] These actions are explained by the editor's admission at trial that she had "made a conscious decision not to inquire into whether the statements contained in it were true or false."[14] She also testified that she could have published the letter even though persuaded that several or all of the statements in it were false. In addition, the jury was entitled to consider that the PTCN was a trade newspaper with a pecuniary interest in advancing the interests of the chemical industry.[15]

Given the admissions by the editor about her subjective intent, the evidence in the record indicates that the PTCN had wholly abandoned all responsibility for accurately reporting the news. The preservation of open and vigorous public debate does not require protecting such deliberate and callous indifference to the truth or falsity of the Hanna letter.

■ The News also argues that it was error to instruct the jury that it could consider departures from normal journalistic practices in assessing malice. It contends that the plaintiff must show that the defendant subjectively "entertained serious doubts as to the truth of his publication." *Ryan v. Brooks*, 634 F.2d 726, 732 (4 Cir. 1980) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968)). While the News editor admitted to conducting no investigation, "[a]s long as the sources of the libelous information appeared reliable, and the defendant had no doubts about its accuracy, the courts have held the evidence of malice insufficient to support a jury verdict, even if a more thorough investigation might have prevented the admitted error." *Ryan*, 634 F.2d at 734.

The defendant incorrectly suggests these facts are irrelevant to the determination of actual malice. In our view, the jury may consider such a departure as part of its overall determination of knowledge of or reckless disregard for falsity. *Harte–Hanks*, 109 S.Ct. at 2686. The district court in this case explicitly pointed out that a failure to investigate, standing alone, could not support a finding of actual malice. The court then properly allowed the jury to consider departures from accepted standards of journalistic practices as evidence of the knowledge or reckless indifference of the News.[16]

■ The News also argues that because it accurately reported the contents of the reprimand letter, it cannot be guilty of acting with actual malice.[17] The News relies in part on *Greenbelt Cooperative Pub-*

13. *Cf. Harte–Hanks, Inc. v. Connaughton,* — U.S. ——, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) (finding actual malice in part for a failure to contact key individuals or listen to available tapes); *Curtis Publishing Company v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (finding actual malice in part for a failure to review notes or contact readily available witnesses to verify information).

14. In *Harte–Hanks,* the Supreme Court found that evidence of an "intent to avoid the truth" could support a finding of actual malice. 109 S.Ct. at 2698.

15. The Supreme Court has stated that "a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence . . . and it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry" (citations omitted). *Harte–Hanks,* 109 S.Ct. at 2686.

16. The News contends that the evidence showed no more than a mere lack of investigation. However, the judge clearly instructed the jury that a mere failure to investigate was not sufficient to find actual malice. The jury then found actual malice, and the evidence introduced at trial supports this finding. As discussed in the text, the newspaper did not just negligently fail to investigate. Rather, it made a conscious and deliberate decision to avoid learning the truth. At best, the PTCN was extremely reckless about the accuracy of the Hanna letter.

17. The News cannot escape liability merely by claiming that it accurately reported the contents of the letter. Under the republication rule, the News is deemed to have adopted the Hanna letter as its own statement. *Cf. Lee v. Dong–A Ilbo,* 849 F.2d 876, 878 (4 Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1343, 103 L.Ed.2d 812 (1989). An exception exists for the reporting of official actions, such as public hearings or judicial proceedings. 849 F.2d at 878. However, it is not clear that this was an official action, and the privilege can be overcome by a showing of actual malice. *Steer v. Lexleon, Inc.,* 58 Md. App. 199, 472 A.2d 1021 (1984).

*lishing Ass'n v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970), which reversed a defamation verdict against a newspaper.[18] In *Bresler,* the paper had reported the events at a tumultuous public hearing before the local zoning commission. Several speakers accused the plaintiff of "blackmailing" the city, and the newspaper reported those attacks. The Court held that "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole." *Id.* at 14, 90 S.Ct. at 1542. Nobody thought that the plaintiff had been charged with a crime.

This case is substantially different. The article in the PTCN did not report on a public hearing or a trial. Rather the article disclosed a private letter of reprimand written by the employee of a private company. It is not at all clear that such a letter constitutes an "official action" sufficient to invoke the privilege. Even if the Hanna letter was an official action, the readers were given the impression that the charges lodged against Reuber were true, not "rhetorical hyperbole." While the media enjoys greater latitude in reporting some public events, such as trials, such latitude does not extend to this case.

### c. *Public Figure*

The lower court found that Reuber was a private figure. This finding meant that Reuber could recover compensatory damages with a showing of negligence and only had to show actual malice to recover punitive or presumed damages. *Gertz,* 418 U.S. at 347, 94 S.Ct. at 3010. The News contends that Reuber is a public figure and may not recover anything without showing actual malice. Reuber may well be a limited purpose public figure for cancer research issues.[19] However, because we affirm the jury verdict finding actual malice, we need not, and do not, decide the public figure issue.

### d. *The Jury Verdict*

After the jury answered the initial set of interrogatories, the district court realized that the responses were ambiguous. To clarify the verdict, it submitted two additional questions asking whether the letter and/or the News article about the letter contained one or more false statements. It also allowed the jury to reconsider the damage award. The jury answered both questions in the affirmative and increased the compensatory damage award by $125,000.

The News contends that this procedure erroneously allowed Reuber to recover twice for the same injury under different claims. The district judge, it argues, should not have allowed the jury to alter its damage award after answering the clarifying interrogatories about the falsity of the

---

**18.** Also compare *Cox Broadcasting v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975) (holding that the First Amendment prohibits an invasion of privacy action for publication of the name of a rape victim available on a public record).

**19.** The News claims that Reuber was a public figure on two separate theories. First, it claims that Reuber is a "public official" by virtue of his employment at Litton and work at the FCRC. It seems fairly clear from the record that Reuber did not have "substantial responsibility for or control over the conduct of government affairs." *Rosenblatt v. Baer,* 383 U.S. 75, 85, 86 S.Ct. 669, 676, 15 L.Ed.2d 597 (1966). Rather, he provided a "narrowly defined professional service in a highly technical field." *Arctic Co. v. Loudoun Times Mirror,* 624 F.2d 518, 521–22 (4 Cir.1980) (holding a consultant company engaged in historical and archaeological research not to be a public official), *cert. denied,* 449 U.S. 1102, 101

S.Ct. 897, 66 L.Ed.2d 827 (1981). Also compare *Kassel v. Gannett Co., Inc.,* 875 F.2d 935 (1 Cir.1989) (applying a three-part test to uphold a finding that a staff psychologist at the Veteran's Administration was not a "public official").

The News' second argument that Reuber is a public figure is that his involvement with the problems of carcinogens, public health, and, in particular, the malathion controversy renders him a limited purpose public figure under the standard of *Gertz v. Robert Welch,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). This argument has some merit. The interest in public health hazards, such as cancer-causing chemicals in food, can be exceptionally strong as indicated by the controversy in California surrounding the use of malathion. In addition, the EPA banned several chemicals based in part on Reuber's work. Because his work has such a direct impact on public welfare, Reuber's qualifications as a pathologist may be a legitimate subject of public inquiry.

letter and article.[20] If the second set of questions merely clarified that the jury meant to hold the defendant liable for defamation by acting with actual malice, and not with just negligence, then the damage award from the first set of special verdict questions should not have needed revision. However, the district judge carefully worded the third set of questions submitted to the jury to avoid that problem.

It was possible that, because of the wording of the first set of questions, the jury did not realize that the News was liable for both defamation and invasion of privacy.[21] After the second set of questions clarified that the News was liable for both claims, the jury was asked if the knowledge that the defendant was liable for both defamation and invasion of privacy changed its damage determination. This question gave the jury an opportunity to say that it had not been misled and that no change in the damage award was warranted. We believe that the district judge adequately resolved any ambiguity in the verdict.[22]

### e. Evidence of Damage

■ The News asserts that Reuber failed to prove any damages. The record contains extensive evidence concerning Reuber's inability to find work, lost reputation, mental anguish, and lost earnings.

**20.** The News asserts, but does not explain, that the defamation and privacy claims were mutually exclusive. This argument is incorrect. Defamation is publication of a false statement while invasion of privacy is revelation of a private fact. A jury could reasonably have found both in this case.

**21.** The damages for invasion of privacy and defamation do not completely overlap, so the jury was entitled to change its award if it had misunderstood the defendant's liability.

**22.** A separate question on the special verdict form for each element of each claim would have avoided this difficulty in the first place. Once the ambiguity became apparent, however, submission of supplementary interrogatories aided the district court in its duty to harmonize, if possible, potentially contradictory responses to special interrogatories. *Gallick v. Baltimore & Ohio R. Co.*, 372 U.S. 108, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963).

The appellants correctly point out that a judge may not resubmit interrogatories when faced

The News does not dispute this evidence, but disputes that publication of the Hanna letter in the PTCN article caused these problems. It argues that Reuber's losses stemmed not from publication of the letter by Food Chemical News, but from pre-existing conditions, his voluntary resignation, the issuance of the letter by Hanna, and/or his lawsuit against Litton. The News may be correct that some of Reuber's losses stem from these other causes.[23] However, we cannot say that the jury was unreasonable in finding that at least some of Reuber's damages are attributable to the article published by the News.

■ In addition, the News argues in its brief under seal that the district judge unfairly excluded evidence on Reuber's medical and psychological background that would mitigate damages. The defense was able to introduce extensive evidence about Reuber's past medical history. The judge excluded some evidence under Rule 403, Fed.R.Evid., because it was of marginal probative value and unduly prejudicial. On this record, we cannot say that the judge abused his discretion in excluding a limited amount of potentially inflammatory evidence.

### 2. Invasion of Privacy

■ The judge instructed the jury that invasion of privacy is "the intrusion upon

with "a decisive verdict, an unequivocal finding of no wrongful conduct by [the defendant]." *McCollum v. Stahl*, 579 F.2d 869, 871 (4 Cir. 1978) (finding error where resubmission of the interrogatories was "tantamount, in its effect, to a direction to the jury to find liability...."), *cert. denied*, 440 U.S. 912, 99 S.Ct. 1225, 59 L.Ed.2d 460 (1979). The district court in this case did not face such an "unequivocal" verdict. When an ambiguity arises, the district court may clarify the special verdict with supplemental interrogatories. *Taylor v. Home Insurance Company*, 777 F.2d 849, 858–59 (4 Cir.1985) (upholding resubmission of questions to clarify damage award). *See also McLaughlin v. Fellows Gear Shaper Co.*, 786 F.2d 592, 597 (3 Cir.1986) (allowing resubmission under Fed.R.Civ.P. Rule 49).

**23.** The compensation awarded by the jury was substantially less than the damages claimed by Reuber. This result may suggest that the jury attributed some of his losses to sources other than the article published by the News.

another person's solitude, seclusion, private affairs or concerns in a manner which would be highly offensive to a reasonable person ... [or] the publicizing of true facts concerning the private life of another which are not of legitimate concern." Restatement (Second) of Torts §§ 652B, 652D (1981); *Hollander v. Lubow*, 277 Md. 47, 351 A.2d 421 (1976). The jury found the News liable for invasion of privacy, but the News argues that it is entitled to a judgment n.o.v. on this claim.[24] We review the question of whether a jury could have reasonably found that the article publicized private facts in a highly offensive manner about an issue not of legitimate concern.

Evidence in the record is more than ample to support a jury finding that the News article contained private facts. The administrator of a private corporation, Hanna, placed a private letter of reprimand in the personnel file of an employee, Reuber. Reuber's employment contract provides that "[c]onfidential information ... shall not be disclosed without prior written consent of the individual, institution or organization." While this statement may suggest that either the individual or the organization could authorize disclosure, the testimony of an individual at the FCRC indicated that such information was in fact kept confidential and was not disclosed to the outside or to other employees unless necessary. The NCI later refused to produce the letter in response to a Freedom of Information Act request because it would "constitute an unwarranted invasion of the personal privacy of the addressee." Even the News' editor admitted that Reuber had a "legitimate right to feel that a confidential scathing letter of reprimand that belongs in his personnel file should not be made public."

Given the private nature of the letter, the jury could have found that a reasonable person would be highly offended to see widespread distribution of its contents in a newspaper article. The only remaining question is whether the contents of the letter were a matter of legitimate public concern. "In determining what is a matter of legitimate public interest, account must be taken of the customs and conventions of the community. [It is] a matter of community mores." Restatement (Second) of Torts § 652D comment h (1981). Moreover, "[s]ome reasonable proportion [should] be maintained between the event or activity that makes the individual a public figure and the private facts to which publicity is given." [25]

The News contends that Reuber's employment record was a matter of public concern because he had thrust himself into the public eye by becoming involved with public health care issues. For support the News cites *Bilney v. Evening Star Newspaper Co.*, 43 Md.App. 560, 406 A.2d 652 (1979). In *Bilney*, the court denied recovery for the publication of the academic standing of several members of the University of Maryland basketball team after the coach, "Lefty" Driesell, had been quoted by the *Washington Post* as saying that a number of players were on academic probation. The court reasoned that the information was of public concern because academic standing affected the eligibility of players on a major college basketball team. "Having sought and basked in the limelight, by virtue of their membership on the team, appellants will not be heard to complain when the light focuses on their potentially imminent withdrawal from the team." *Id.*, 406 A.2d at 660. The court thus af-

---

**24.** The News points out that it did not physically intrude into Reuber's personal life or physical belongings, which is required for the tort of intrusion upon the seclusion. Restatement (Second) of Torts § 652B. However, it is clear from the evidence at trial and the arguments of counsel that the focus was on the publication of private facts. We confine our review to the publication of private facts theory. *Cf. Braun v. Flynt*, 731 F.2d 1205 (5 Cir.1984) (upholding a "false light" invasion of privacy verdict against the defendant even though the judge erroneous-

ly instructed the jury on an "appropriation" theory where it was "reasonably certain" that the jury was not significantly influenced by the error.).

**25.** For example, "[r]evelations that may properly be made concerning a murderer or the President of the United States would not be privileged if they were made concerning one who is merely injured in an automobile accident." *Id.*

firmed summary judgment for the defendants on the invasion of privacy claim.

The *Bilney* decision does not, however, control the outcome in this case. The existence of some legitimate public interest in an issue does not eliminate all rights to privacy held by the individual. Rather, Maryland law calls for a balancing of the public and private interests at stake. "The extent of the authority to make public private facts is not, however, unlimited.... Some reasonable proportion is also to be maintained between the event or activity that makes the individual a public figure and the private facts to which publicity is given." *Bilney*, 406 A.2d at 660 (quoting the Restatement (Second) of Torts § 652D comment h). Thus the court in *Bilney* granted summary judgment because it found that a legitimate public interest existed *and* that the interest outweighed the players' privacy concerns.

Even where a tight nexus exists between the facts revealed and the public interest, the privacy interest may outweigh any legitimate public concern. For example, in *Capra v. Thoroughbred Racing Association*, 787 F.2d 463, 464 (9 Cir.), *cert. denied*, 479 U.S. 1017, 107 S.Ct. 669, 93 L.Ed.2d 721 (1986), the defendant had published the true identity of a family relocated under the federal witness protection program. The district court held that the information publicized was newsworthy and granted summary judgment on the invasion of privacy claim. The Court of Appeals agreed that the information was "noteworthy, if not newsworthy," but reversed and remanded. The court held that, applying a balancing test, "a reasonable jury ... could find that the press release was not newsworthy as to one or more of the plaintiffs." [26]

Turning to the case at hand, we agree that the public has some legitimate interest in the caliber of Reuber's work as a pathologist. We also recognize that the Hanna letter bears at least indirectly on this issue. The existence of a connection between the letter and his work as a pathologist does not, however, end the inquiry.

Maryland law requires a comparison of the public and private interests at stake, and the responsibility for striking the balance rests with the jury. We cannot say that the jury was unreasonable as a matter of law in finding that any public interest in the letter was outweighed by Reuber's interest in keeping his personnel file private.[27] To hold otherwise would virtually eliminate the right to privacy for any person doing work even indirectly relating to a public issue. Reuber was not a star player on a Division I team who "sought and basked in the limelight" of a nationally televised spectator sport. Rather, he was a laboratory researcher in a private corporation. The News did not disclose Reuber's grade point average in response to on-going public speculation about which players were on academic probation; it revealed information from his confidential personnel file to initiate a general attack on his credibility.[28] The News did not accurately report his grades; it carelessly printed a false letter of reprimand.[29] While the jury might have reasonably found that Reuber's privacy interest had not been violated, we cannot say as a matter of law that every researcher in a private corporation or univ-

**26.** In *Capra*, the court explained that the jury should use a three-part balancing test in determining "newsworthiness." The court said that the jury should weigh: (1) the social value of the facts published, (2) the depth of the publication's intrusion into ostensibly private affairs, and (3) the extent to which the party voluntarily assumed a position of public notoriety. *Id.* at 465. While Maryland has not formally adopted this test, the decision in *Bilney* reflects a concern for these three factors, particularly the voluntary assumption of a position of public notoriety.

**27.** We address here only the adequacy of the record to support the "legitimate concern" element of the common law tort of invasion of privacy and not the First Amendment concerns which arise. We consider limitations imposed by the First Amendment below.

**28.** To the extent that a controversy existed in California over the use of malathion, the News editor admitted that she did not publish the article in the context of that controversy.

**29.** One reason for keeping a personnel file confidential is that information placed in the file, such as the letter written by Hanna, is not necessarily screened for its accuracy.

ersity and every bureaucrat whose work has some impact on an issue of public concern loses all privacy interests in his or her confidential personnel file.[30]

Even if the letter was not of legitimate public interest under the common law right to privacy, a question remains as to whether the First Amendment interest in free expression bars recovery for invasion of privacy in this case. The News relies on the Supreme Court decision in *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975), to show that defendants charged with invasion of privacy receive the same protection under the First Amendment as those charged with defamation. If so, then a plaintiff may not recover for invasion of privacy without showing falsity and actual malice.[31] However, the Court in *Cox* confined its decision to the "publication of the name of a rape victim obtained from public records ... *which themselves are open to public inspection.*" *Id.* at 491, 95 S.Ct. at 1044 (emphasis added). The Court expressly recognized that individuals maintain a

privacy interest even in true facts that must be weighed against the societal interest in free expression.[32] As discussed above, the Hanna letter was not a public record open to public scrutiny. It was a letter written by the administrator of a private corporation about a private employee. Even if Reuber is a public figure, not all of his life is laid bare to public scrutiny. Employees of public agencies, who clearly affect public decisions, have a privacy interest in their personnel files. Congress makes an exception to the Freedom of Information Act for all "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The jury could have reasonably found that he had a legitimate expectation not to have the letter publicized.[33]

While this case is distinguishable from *Cox* and others in which the Supreme Court has applied the actual malice standard,[34] we would affirm the judgment for invasion of privacy whether or not the heightened

---

**30.** We note that the state of Maryland protects the personnel records of its employees from disclosure even though many, if not most, perform tasks related to matters of public interest and the personnel records would often shed light on the employees' qualifications to perform their jobs. Maryland State Government Code Ann. § 10–616(h) (1984).

**31.** Applying the "actual malice" standard of *New York Times* to torts, such as invasion of privacy, where truth or falsity is not usually an issue requires the plaintiff to show falsity in addition to the other elements of the claim. *Cf. Hustler Magazine v. Falwell*, 485 U.S. 46, 56, 108 S.Ct. 876, 882, 99 L.Ed.2d 41 (1988) ("public figures ... may not recover for the tort of intentional infliction of emotional distress ... without showing in addition that the publication contains a false statement of fact which was made with 'actual malice'...."). Because the tort of intentional infliction of emotional distress is closely related to the tort of invasion of privacy, the *Falwell* decision also indicates that the actual malice standard may apply to invasion of privacy claims by public figures. *See* Post, *The Constitutional Concept of Public Discourse: Outrageous Opinion, Democratic Deliberation, and* Hustler Magazine v. Falwell, *103 Harv.L.Rev. 603, 614–15 (1990) (discussing the implications of* Falwell *in general and suggesting that the rationale underlying the decision may extend to invasion of privacy claims).*

**32.** The Supreme Court recently stated that "[n]or need we accept appellant's invitation to hold broadly that truthful publication may never be punished consistent with the First Amendment. Our cases have carefully eschewed reaching this ultimate question, mindful that the future may bring scenarios which prudence counsels our not resolving anticipatorily." *The Florida Star v. B.J.F.*, —— U.S. ——, 109 S.Ct. 2603, 2608, 105 L.Ed.2d 443 (1989).

**33.** This case is also distinguishable from *Cox* because it does not involve a judicial proceeding. In reversing a judgment against the defendant for publishing the name of a rape victim, the Court emphasized the "special protected nature of accurate reports of judicial proceedings." *Cox*, 420 U.S. at 492, 95 S.Ct. at 1045.

**34.** *See, e.g., Oklahoma Publishing Co. v. District Court*, 430 U.S. 308, 97 S.Ct. 1045, 51 L.Ed.2d 355 (1977) (finding unconstitutional a state court's pretrial order enjoining the media from publishing the name or photograph of an 11–year–old boy in connection with a juvenile proceeding); *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979) (striking down the indictment against two newspapers for publishing the name of a youth charged as a juvenile offender); and *The Florida Star v. B.J.F.*, —— U.S. ——, 109 S.Ct. 2603, 2608, 105 L.Ed.2d 443 (1989) (barring recovery for publication of rape victim's name when newspa-

standard applies. As discussed above, the jury found that the News article contained false statements of fact and that the News acted with actual malice. Thus, Reuber would prevail under the highest standard of constitutional protection available to the defendant.

The News also contends that the reprimand letter was not private because it was already in circulation. However, the fact that one or two individuals outside Litton and the NCI had obtained the letter (or even if it had been posted on an EPA bulletin board, which was disputed) does not mean that the more extensive republication by the News could not constitute an invasion of privacy. As the Supreme Court recently noted in upholding a privacy interest in FBI rap sheets, "there is a vast difference between the public records that might be found after a diligent search of courthouse files, county archives, and local police stations throughout the country and a computerized summary located in a single clearinghouse of information." *Department of Justice v. Reporters Committee for Freedom of the Press*, — U.S. —, 109 S.Ct. 1468, 1477, 103 L.Ed.2d 774 (1989). By the same token, a vast difference exists between the leak of the letter to one or two individuals and the widespread publication of the letter in a newspaper catering to the industry most involved with Reuber's field of study. In short, the jury could have reasonably found that Reuber had a legitimate expectation of privacy in the letter, and its publication violated that right.

### III. Litton and the Individual Defendants (No. 88–2642)

#### 1. *First Amendment Claims*

Reuber filed a *Bivens*-type First Amendment claim against Litton and the individu-al defendants which the district court dismissed.[35] He appeals and argues that the District of Columbia Circuit reversed the prior dismissal of his First Amendment claim against Litton and remanded for proceedings on the merits.[36] The dismissal, he claims, violates this mandate. After the case had been remanded by the District of Columbia Circuit and then transferred to the District of Maryland, the magistrate recommended dismissal for either of two reasons. First, the subsequent D.C. district court decision on Reuber's Privacy Act claims against the U.S. and HHS collaterally estopped Reuber from litigating the First Amendment issue against Litton. Second, the individuals were entitled to qualified immunity because they did not violate any "clearly established" First Amendment rights to speak. We examine each of these reasons in turn.

#### a. *Collateral Estoppel*

The District of Columbia district court held in 1984 that Reuber "had no first amendment right to dispute NCI bioassays without either getting NCI clearance or insuring that his views would not be taken for those of NCI." If Reuber had no First Amendment right to speak in the manner described in the letter, then he would have no claim against Litton and the individual defendants. The magistrate in Maryland found that this holding collaterally estopped Reuber from pursuing his First Amendment claims against Litton and the individual defendants. On appeal, however, the D.C. Circuit's later disposition rendered that portion of the district court's decision unnecessary. *Reuber v. United States*, 829 F.2d 133, 142 (D.C.Cir.1987).

---

per legally obtained information from police report). In these cases, the information published by the newspapers had been "publicly revealed" or was "in the public domain." *Florida Star*, 109 S.Ct. at 2610.

**35.** While *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), dealt with the Fourth Amendment, "its logic appears ... equally applicable to a First Amendment violation." *Yiamouyiannis v. Chemical Abstracts Serv.*, 521

F.2d 1392, 1393 (6 Cir.1975), *cert. denied*, 439 U.S. 983, 99 S.Ct. 573, 58 L.Ed.2d 654 (1978). *Cf. States Marine Lines, Inc. v. Shultz*, 498 F.2d 1146 (4 Cir.1974) (applying *Bivens* to the Fifth Amendment).

**36.** Because of the procedural posture, the D.C. Circuit assumed that Reuber's allegations that Litton acted in concert with the NCI were true, so state action existed.

Thus collateral estoppel does not apply. *See, e.g., International Refugee Organization v. Republic S.S. Corp.,* 189 F.2d 858, 862 (4 Cir.1951).[37]

The defendants have raised other collateral estoppel arguments not relied upon by the district court in dismissing Reuber's First Amendment claims. They argue that the D.C. Circuit affirmed the D.C. district court's finding that the decision to write the letter was ultimately Hanna's, a Litton employee, and was not a "determination" by NCI. *Reuber,* 829 F.2d at 140. This finding, they argue, indicates that Litton acted alone, so no state action exists. Defendants fail to recognize that a "determination" as used in a subsection of the Privacy Act (5 U.S.C. § 552a(e)(5)) is not a perfect synonym for "state action." Reuber's First Amendment claims only require an attempt to restrict his freedom of speech or a "thumb on the scale" of private decision-making. It is possible that NCI involvement was sufficient to constitute state action even if NCI actions did not constitute a "determination." Because the issues are different, collateral estoppel does not apply. *Cf. Sine v. Local No. 992, International Brotherhood of Teamsters,* 730 F.2d 964, 967 (4 Cir.1984).

### b. *Qualified Immunity*

■ The district court also adopted the magistrate's dismissal of the First Amendment claims against Litton and the individual defendants on the alternative grounds that they enjoyed qualified immunity under *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), and *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Under the *Harlow* test:

government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

457 U.S. at 818, 102 S.Ct. at 2738.[38] The magistrate reasoned that because the D.C. district court and the D.C. Circuit had disagreed about whether Reuber had a First Amendment right to dispute NCI studies, the right could not be "clearly established," so immunity applied. Because of this holding, the magistrate found it sufficient to assume, without deciding, that state action existed.

The NCI employees provide another reason why Reuber's right to publicize his views about malathion and other chemicals was not "clearly established." His right to speak, they claim, must be balanced against the government interest in an accurate presentation of its views and in preserving its credibility. *See Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The outcome of such a balancing test, they say, is not clear in advance, so Reuber's right to speak in the manner he chose was not "clearly established." [39]

The propriety of the magistrate's holding and the arguments advanced by the defendants turn on the factual question of why Reuber was reprimanded. Reuber "alleges that he was punished because his remarks were critical of the federal government, and that is precisely the kind of speech the first amendment was designed to protect." *Reuber v. United States,* 750 F.2d 1039, 1065 (D.C.Cir.1984) (Bork, J., concurring). If true, then his claim goes to the heart of the interests protected by the First Amendment, and the defendants could not have reasonably believed they were acting with-

---

**37.** The district court below acknowledged this difficulty, but appeared to rely on the alternative grounds for dismissal in the magistrate's opinion.

**38.** When the D.C. Circuit remanded the First Amendment claims for proceedings on the merits in 1984, it noted that the defendants would have this qualified immunity as an affirmative defense. *Reuber,* 750 F.2d at 1057 n. 25.

**39.** The Supreme Court said in *Pickering* that "[b]ecause of the enormous variety of fact situations in which critical statements by ... public employees may be thought by their superiors ... to furnish grounds for dismissal, we do not deem it either appropriate or feasible to attempt to lay down a general standard against which all such statements may be judged." 391 U.S. at 569, 88 S.Ct. at 1735.

in their rights. *Cf. Daulton v. Affeldt,* 678 F.2d 487 (4 Cir.1982) (upholding jury verdict against college for violating First Amendment in failing to rehire teacher).[40] We thus conclude that the magistrate and the district judge erred on both of the alternative grounds for granting summary judgment on Reuber's First Amendment claims.[41]

### c. Summary Judgment

■ While we find that the district court erred in the basis for its granting of summary judgment on Reuber's First Amendment claims, we affirm the ruling on other grounds. Reuber's allegations state a valid cause of action under the First Amendment. However, he bears the burden of proving that state action exists and that the defendants acted with an intent to suppress his substantive viewpoint. An examination of the record reveals insufficient evidence to reach a jury on either issue.

We turn first to the question of state action. The NCI employees are state actors, but the actions of Litton and its employees constitute state action only if they acted in concert with the NCI. In *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), the Supreme Court held that:

> a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State. Mere approval of or acquiescence in the

initiatives of a private party is not sufficient. . . .

457 U.S. at 1004–05, 102 S.Ct. at 2786 (citations omitted). The evidence indicates that Hanna discussed the situation concerning Reuber with officials at the NCI. However, nothing Reuber offers suggests that the NCI exerted control over Hanna's decision. We conclude that Reuber has alleged facts sufficient to constitute state action, but has failed to provide evidence to support those allegations. *Cf. Yiamouyiannis v. Chemical Abstracts Serv.,* 578 F.2d 164 (6 Cir.) (upholding dismissal of a *Bivens* First Amendment claim for lack of evidence of state action after a prior remand on that issue), *cert. denied,* 439 U.S. 983, 99 S.Ct. 573, 58 L.Ed.2d 654 (1978).

Reuber must also show that "the content of [his] study was a factor in the government's and defendant's joint decision to penalize Reuber. If it was, the burden would shift to the defendants to show that, even absent the improper motive, the punitive action taken against Reuber would have occurred anyway." *Reuber,* 750 F.2d at 1059. In one sense, the content of his study was a factor. It was because his results differed from the results of the official NCI study that confusion arose and people made inquiries about the official NCI position. Hanna indicated in letters to NCI officials and to Reuber that it was those inquiries that prompted him to investigate Reuber's activities.

While the content of the study may have prompted the investigation, no evidence indicates that the content was a factor in the decision to reprimand Reuber. Hanna indi-

**40.** The NCI employees argue that Reuber failed to prove in the D.C. Privacy Act litigation that any particular individual or group of individuals was responsible for leaking the letter. This failure, they claim, should collaterally estop Reuber from relitigating the issue in Maryland. Such a holding, however, would not warrant dismissal of Reuber's First Amendment claim. The NCI employees may have violated Reuber's constitutional rights merely by encouraging Hanna to write the letter. The subsequent leak to the outside increased the damage, but would not have been necessary to establish a violation.

**41.** The NCI employees argue that they are entitled to judgment as a matter of law on the

merits of Reuber's First Amendment claims against them. They argue that the government interest in protecting the credibility of the NCI and in avoiding an inaccurate presentation of its views outweigh any First Amendment right which Reuber may have had. This argument also turns on the factual question of why the defendants sanctioned Reuber. The NCI interests may justify some regulation of Reuber's activities, but they cannot justify deliberate suppression of substantive viewpoints to achieve consensus. As discussed below, Reuber has not provided sufficient evidence of improper motivation for the reprimand.

cated in his letters that he was focusing his inquiry on the administrative propriety of Reuber's actions. He pointed out that Reuber may have raised a legitimate scientific question that needed to be answered. In the actual letter of reprimand, Hanna clarified that he was "not interested in thwarting [Reuber's] efforts on behalf of public concern for environmentally mediated health problems, but rather, [sought] to channel these efforts in a legitimate manner that will gain the respect and support of all parties concerned." The evidence indicates that Hanna decided to sanction Reuber for the procedures Reuber used to disseminate his views and not for the content. Reuber asserts that the decision was based on his substantive viewpoint, but his subjective belief alone does not create a genuine issue of material fact.

Because Reuber has been unable to prove either that state action exists or that Hanna's letter stemmed from an improper motive to suppress his substantive views, Litton, the Litton employees, and the NCI employees are entitled to summary judgment in their favor on the First Amendment claims.

### 2. *Common Law Claims*

In his appeal from the grant of summary judgment in favor of the defendants on his common law claims, Reuber pursues only his claims against Litton and the Litton employees. He specifically abandons his claims against the NCI employees.[42] While Reuber has not made clear exactly which common law claims he intended to preserve on appeal, we do not find sufficient evidence for Reuber to pursue any of these claims.

#### a. *Immunity*

The magistrate dismissed the common law claims against Litton and the Litton

employees on the basis of immunity. He reasoned that because Reuber argued in his First Amendment claim that they were acting under color of federal law (i.e. state action), he "must now bear the burden of his previous argument and cannot, for purposes of his common-law claims, maintain that these defendants are not federal actors." The magistrate erred in making this ruling.

Rule 8(e)(2), Fed.R.Civ.P., states that:

A party may set forth two or more statements of a claim or defense alternately or hypothetically.... A party may also state as many separate claims or defenses as the party has regardless of consistency....

It may be true that Reuber could not *prevail* in both his First Amendment and his common law claims against Litton and its employees. For example, if Reuber were to win a judgment against Litton on the First Amendment claim, then he might be estopped from pursuing his common law claims. However, Reuber *lost* on his First Amendment claims. Moreover, the lower court assumed state action "without deciding that issue." As long as a judgment has not been issued requiring a finding that Litton and its employees were state actors, Reuber may pursue his common law claims.

#### b. *Publication*

■■■ Reuber stipulated before trial that he could not prove who leaked the Hanna letter. The defendants argue that proving who leaked the letter is crucial to the common law claims, so they should be dismissed. Reuber responds that he may prevail on his common law claims without proving specifically who leaked the Hanna letter.[43] While he points to several valid

---

**42.** Because of the Federal Employees Liability Reform and Tort Compensation Act of 1988, the United States had been substituted for the NCI employees as defendants on the common law claims.

**43.** Litton and the other defendants argue that Reuber waived his right to object to the district court's ruling that all of his common law claims hinge on proving that Litton was responsible for

making the letter public. *See* Fed.R.Civ.P. Rule 72(b). However, Reuber challenged the ruling that the defendants enjoyed immunity as federal actors. It was this holding that led to the conclusion that Litton and its employees would only be liable for an intentional leak. Thus, by challenging the immunity ruling, he preserved the argument for appeal.

theories, the evidence in the record does not support these contentions.

Defamation requires publication of a false statement. Reuber points out that Litton is liable for republication of the Hanna letter if such republication was the reasonably foreseeable consequence of the original distribution by Hanna. *Luster v. Retail Credit Co.*, 575 F.2d 609, 613–14 (8 Cir.1978). While this theory is valid, Reuber has failed to introduce any evidence suggesting that such a leak was reasonably foreseeable. Hanna placed the letter in Reuber's confidential personnel file and distributed it only to those individuals at Litton and NCI who had a working need to know the contents. The possibility that the letter could be leaked does not suffice to reach the jury on this issue. *Cf. Peacock v. Retail Credit Co.*, 302 F.Supp. 418 (N.D. Ga.1969) (noting lack of foreseeability where contract provision prohibited republication), *aff'd*, 429 F.2d 31 (5 Cir.1970).

Nor has Reuber introduced any evidence to show that Litton or the Litton employees were negligent in allowing the publication of the letter in the News article. Without such a showing, a jury cannot, as Reuber suggests, find Litton to be a joint tortfeasor who is jointly liable with whomever leaked the letter.

Reuber's last theory is that if Litton engaged in a conspiracy with NCI, then a jury could hold Litton liable for the acts of NCI officials in furtherance of the conspiracy. In this case, Reuber would only have to prove that either Litton or NCI leaked the letter. However, the same lack of evidence that precludes a finding that Litton and its employees were state actors also precludes a finding that they conspired with NCI. The evidence merely indicates that Hanna communicated with officials at the NCI. The record contains no evidence of an agreement.

While the lower court erred in applying immunity to Litton and the Litton employees as federal actors, Reuber has failed to produce enough evidence to survive summary judgment on his common law claims.

## IV. Reuber: Rule 11 Sanctions (No. 88–2643)

Finally, Litton moved for sanctions against Reuber under Fed.R.Civ.P. Rule 11. Its main contention was that Reuber pressed his claims against Litton despite the fact that he had no proof that Litton had leaked the letter. The district court denied the motion without comment. Normally, this decision is reviewed for abuse of discretion. *Introcaso v. Cunningham*, 857 F.2d 965 (4 Cir.1988). Litton argues that it should be reviewed de novo because the lower court gave no reasons for the denial. Under either standard, however, we affirm the district court decision.[44]

Particularly given his other claims against Litton, Reuber was entitled to conduct discovery to try to find proof of who leaked the letter. Moreover, as discussed above, Reuber had several theories under which he might have recovered from Litton without proving who leaked the letter. Thus, Reuber and his attorneys had a reasonable basis for signing their pleadings against Litton. We therefore affirm the denial of the petition for sanctions.

Litton's request to have the costs of appeal assessed against Reuber is denied for the same reasons.

AFFIRMED.

---

**44.** Litton also contends that Reuber should not have pursued his First Amendment claims against Litton after the D.C. Circuit affirmed the factual finding that Hanna acted alone, and not in concert with NCI, in reprimanding Reuber.

As discussed above, the D.C. Circuit decision only decided whether NCI made an official "determination," not whether NCI had any involvement at all in the decision.